Filed: 1/17/12

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 12-1067**

---

The Honorable Rick Perry,

        Plaintiff-Appellant-Movant

The Honorable Newt Gingrich, The Honorable Jon
Huntsman, Jr., and the Honorable Rick Santorum,

        Intervenor-Plaintiffs,

      v.

Charles Judd, Kimberly Bowers, and Don Palmer,
members of the Virginia Board of Elections, in
their official capacities,

        Defendants-Appellees-Respondents.

---

ORDER

WILKINSON, AGEE, and DIAZ, Circuit Judges:

The Honorable Rick Perry (hereinafter Movant) has requested this court in an emergency motion to issue an injunction ordering Movant's name "to appear alongside others on the ballot for the Republican primary for the Commonwealth of Virginia, or in the alternative, that this Court issue an injunction ordering the Respondents not to order, print, or mail ballots prior to

the Court's final consideration of this appeal."[1]  On January 13, 2012, the district court denied the Movant's emergency motion for a temporary restraining order and preliminary injunction. This court is required to act with the utmost expedition in ruling upon the emergency motion for injunctive relief because under the Uniformed and Overseas Citizens Absentee Voting Act, respondents must mail requested absentee ballots to military and overseas voters by Saturday, January 21, 2012.  See 42 U.S.C. § 1973ff-1(a)(8)(A).  For the reasons expressed herein, the court denies the motion for the requested injunctive relief.

Movant had every opportunity to challenge the various Virginia ballot requirements at a time when the challenge would not have created the disruption that this last-minute lawsuit has.  Movant's request contravenes repeated Supreme Court admonitions that federal judicial bodies not upend the orderly progression of state electoral processes at the eleventh hour. Movant knew long before now the requirements of Virginia's election laws.  There was no failure of notice.  The requirements have been on the books for years.  If we were to grant the requested relief, we would encourage candidates for

---

[1] The Honorable Newt Gingrich, intervenor in the proceedings below, has filed a notice of appeal.  He has notified the court that he supports Movant's emergency motion, and our ruling necessarily applies to him as well.  No papers have been filed by the Honorable John Huntsman or the Honorable Rick Santorum regarding Movant's emergency motion.

President who knew the requirements and failed to satisfy them to seek at a tardy and belated hour to change the rules of the game. This would not be fair to the states or to other candidates who did comply with the prescribed processes in a timely manner and it would throw the presidential nominating process into added turmoil.

I.

A.

Like many states, Virginia has a comprehensive regulatory scheme governing its various elections, including presidential primary contests. Under the Commonwealth's election laws, a candidate seeking to participate in a Virginia presidential primary is required to file with the Virginia State Board of Elections (the Board) "petitions signed by at least 10,000 qualified voters, including at least 400 qualified voters from each congressional district in the Commonwealth, who attest that they intend to participate in the primary of the same political party as the candidate . . . by the primary filing deadline." Va. Code Ann. § 24.2-545(B).

In addition to requiring 10,000 signatures from qualified voters, Virginia law places restrictions on who can circulate petitions. According to section 24.2-521 of the Virginia Code, a "candidate for nomination by primary for any office shall be

3

required to file with his declaration of candidacy a petition for his name to be printed on the official primary ballot," and each signature on that petition must "have been witnessed by a person who is himself a qualified voter, or qualified to register to vote, for the office for which he is circulating the petition." Id. § 24.2-521. Among other requirements, one must be "a resident of the Commonwealth" to be qualified to vote in Virginia. Id. § 24.2-101. Consequently, only Virginia residents can serve as petition circulators for the purposes of a Virginia primary election campaign.

Virginia law also provides that the "requirements applicable to a party's primary shall be determined at least 90 days prior to the primary date and . . . approved by . . . the State Board." Id. § 24.2-545(A). The Board in turn is empowered to "make rules and regulations and issue instructions and provide information" that is consistent with the Commonwealth's election laws. Id. § 24.2-103. In keeping with these provisions, the Board adopted a document entitled "Deadlines, Duties and Ballot Access Requirements" for Virginia's 2012 presidential primary contest on May 25, 2011. The document made clear that candidates were required to file their "Consent/Declaration of Candidacy" as well as petitions by December 22, 2011. In its "Petition Requirements," the document also reiterated that a candidate must provide on each page of

4

the petitions "an affidavit signed under oath by the person who circulated it that . . . s/he is registered, or eligible to be registered, to vote in Virginia."

Under this regulatory scheme, a wide array of candidates has managed to access the Virginia primary ballot. In 2008, for example, six candidates qualified for the Virginia Republican primary ballot (Rudy Giuliani, Mike Huckabee, John McCain, Ron Paul, Mitt Romney, and Fred Thompson). And nine candidates qualified for the Virginia Democratic primary ballot in 2004 (Wesley Clark, Howard Dean, John Edwards, Dick Gephardt, John Kerry, Dennis Kucinich, Lyndon LaRouche, Joe Lieberman, and Al Sharpton). Although some of these candidates garnered a small percentage of the primary vote, they all were able to comply with Virginia's 10,000 signature requirement as well as its residency requirement for petition circulators.

B.

Movant filed his Statement of Candidacy with the Federal Election Commission (FEC) on August 15, 2011, and signed and affirmed his Declaration of Candidacy for the Commonwealth of Virginia on October 13, 2011. On December 22, 2011, Movant submitted petitions containing less than 10,000 signatures to the Board.

Intervenor Gingrich filed his FEC Statement of Candidacy on May 16, 2011. On December 22, 2011, he submitted his Virginia

5

Declaration of Candidacy and his petition signatures. Intervenor Gingrich claims that he submitted 11,050 signatures, but the Board states that less than 10,000 of the submitted signatures were valid.

Intervenor Huntsman filed his Statement of Candidacy with the FEC on June 28, 2011. He did not file a Declaration of Candidacy in Virginia or submit any signature petitions to the Board. Intervenor Huntsman's candidacy was withdrawn on January 16, 2012.

Intervenor Santorum filed his FEC Statement of Candidacy on June 6, 2011. The parties disagree as to whether he submitted his Virginia Declaration of Candidacy. Intervenor claims that he submitted more than 8,000 signatures but that the Board refused to accept them because he had not met the 10,000 signature threshold.

On December 22, 2011, the Board announced that Intervenors Huntsman and Santorum had not submitted the requisite petitions under Virginia Code § 24.2-545(B) and would not be certified for the placement of their names on the presidential primary ballot. The next day, December 23, 2011, Republican Party Chairman Pat Mullins made a preliminary determination and publically announced that Movant and Intervenor Gingrich had not submitted enough valid petition signatures to be placed on the ballot. On December 27, 2011, Movant filed a complaint for declaratory and

6

injunctive relief against defendants-respondents Charles Judd, Kimberly Bowers, and Don Palmer, members of the Board, as well as Mullins. On January 4, 2012, Intervenors Gingrich, Huntsman, and Santorum filed a motion to intervene, which the district court granted. Movant and Intervenors (collectively, plaintiffs) alleged that the Commonwealth's residency requirement for circulators and its 10,000 signatures requirement violated their First Amendment freedoms of speech and association and sought a preliminary injunction ordering the defendants to certify them as candidates for the primary ballot.

C.

Following an evidentiary hearing, the district court denied plaintiffs' motion for a preliminary injunction on January 13, 2012. The court first determined that the equitable doctrine of laches barred their request for relief. It found that plaintiffs could have brought their constitutional challenge to Virginia's residency requirement for petition circulators as soon they were able to circulate petitions in the summer of 2011, but instead chose to wait until after the December 22, 2011 deadline before seeking relief. The district court concluded this delay "displayed an unreasonable and inexcusable lack of diligence" on plaintiffs' part that "has significantly harmed the defendants." Specifically, it determined that the delayed nature of this suit had already transformed the Board's

7

orderly schedule for printing and mailing absentee ballots "into a chaotic attempt to get absentee ballots out on time." The district court consequently held that laches barred their request for relief.

While the district court noted that its "decision on laches resolves the motion," it nevertheless addressed the question of whether plaintiffs would be entitled to preliminary injunctive relief in the absence of laches in order to permit the parties "a complete review on any appeal." With respect to their challenge to Virginia's 10,000 signatures requirement, the district court concluded that plaintiffs were unlikely to succeed. Noting that the Commonwealth's requirement was "a minimal number" and that "much more onerous" numeric requirements for accessing the ballot have been upheld previously, the court concluded this election law was not "unduly burdensome" on plaintiffs' rights. The district court found the residency requirement to be more troubling. It determined that Virginia's residency requirement for petition circulators "is highly unlikely to withstand [plaintiffs'] First Amendment challenge" based on its conclusion that the law likely triggered strict scrutiny and was not narrowly tailored to achieve a compelling state interest. The court nevertheless admitted that it "cannot fashion relief that does not include

8

compliance with the 10,000 signature requirement" and denied the requested relief on laches grounds.

D.

On January 15, 2012, Movant filed an emergency motion with this court seeking an injunction ordering the Board to place his name on the ballot or, in the alternative, to delay the mailing of absentee ballots until a final consideration of his motion had occurred. Movant contends that the district court erred in its application of laches and that he meets the requirements for preliminary injunctive relief. His chief challenge continues to be to Virginia's circulator residency requirement, which he contends unconstitutionally abridges his ability to engage in political speech.

We review the district court's denial of Movant's request for a preliminary injunction for "abuse of discretion, accepting the court's findings of fact absent clear error, but reviewing its conclusions of law de novo." Child Evangelism Fellowship of Md., Inc. v. Montgomery County Pub. Sch., 373 F.3d 589, 593 (4th Cir. 2004). We keep in mind that a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). In order to succeed, Movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable

9

harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20.

We also note that Movant seeks mandatory injunctive relief here. Ordinarily, preliminary injunctions are issued to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003). Movant, however, seeks to alter the status quo by having a federal court order the Board to include his name on a primary election ballot. But such "[m]andatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." Id. (citation omitted). Consequently, our "application of th[e] exacting standard of review [for preliminary injunctions] is even more searching when" the relief requested "is mandatory rather than prohibitory in nature." Id.

We cannot grant Movant's request for this extraordinary remedy. We find it unnecessary to address whether Movant would likely succeed in his constitutional challenges because the district court was correct in concluding that the defense of laches bars the requested relief on the instant motion in any event.

10

## II.

Movant contends that the district court abused its discretion in determining that the equitable doctrine of laches bars his motion for a preliminary injunction. We do not agree. An affirmative defense to claims for equitable relief, laches requires a defendant to prove two elements: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." Costello v. United States, 365 U.S. 265, 282 (1961). We believe that the Board was able to satisfy both elements of this defense.

## A.

We shall first consider the question of Movant's lack of diligence. Movant argues that the district court erred in concluding that he was not diligent in pursuing his First Amendment challenge to Virginia's various election laws. To prove a lack of diligence, the Board must show that Movant "delayed inexcusably or unreasonably in filing suit," White v. Daniel, 909 F.2d 99, 102 (4th Cir. 1990), and that is unquestionably what happened here.

Despite the fact he was able to bring these constitutional challenges for over four months before the filing deadline of December 22, 2011, Movant waited until the eleventh hour to pursue his claims. As the district court found, Movant's

11

cognizable injury occurred no later than August 13, 2011, the day on which he declared his candidacy for President. At that point, the Commonwealth's residency requirement prevented him from using non-Virginian petition circulators. As a matter of law, that requirement was ripe for First Amendment challenge. See, e.g., Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006) (holding that a pre-enforcement First Amendment challenge to Virginia's open primary law "presents a purely legal question" and is thus "fit for review"). Moreover, Movant had every incentive to challenge the requirement at that time. Success in an early constitutional challenge would have allowed Movant to maximize the number of his petition circulators and minimize the amount of time it took to acquire the requisite 10,000 signatures. Nevertheless, he chose to sit on his right to challenge this provision until after he had been denied a place on the ballot. This deliberate delay precludes the possibility of equitable relief. For "equity ministers to the vigilant, not to those who sleep upon their rights." Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 879 (1st Cir. 1995).

Movant's delay was not the result of a lack of notice or clarity on the part of Virginia. The Commonwealth's election laws state in unmistakable terms that a "candidate for nomination by primary for any office shall be required to file . . . a petition for his name to be printed on the official

12

primary ballot," Va. Code Ann. § 24.2-521 (emphasis added), and that "[s]uch petitions shall be filed with the State Board by the primary filing deadline." Id. § 24.2-545(B). The Board set December 22, 2011 as the filing deadline for this primary on May 25, 2011. Furthermore, "[e]ach signature on the petition shall have been witnessed by a person who is himself a qualified voter, or qualified to register to vote, for the office for which he is circulating the petition." Id. § 24.2-521 (emphasis added).

Amended in 2000, the circulator residency requirement has been in place for over a decade and has governed multiple presidential primaries. And plaintiffs' own exhibits demonstrate that the Board adopted a document entitled "Deadlines, Duties and Ballot Access Requirements" on May 25, 2011, which stated that "[c]andidates wishing to participate in the presidential primary must follow the procedures outlined below," including the "Petition Requirement[]" that they must "provide an affidavit signed under oath by the person who circulated it that . . . s/he is registered, or eligible to be registered, to vote in Virginia." (emphasis in original). Virginia has done nothing to lead anyone astray with respect to this requirement. The residency requirement for petition circulators was unambiguous and available for all to see. Two candidates had no difficulty discerning or fulfilling these

13

requirements, nor did multiple candidates in presidential primaries in the past. If Movant believed this provision violated the Constitution, he could and should have acted expeditiously.

If we were to find Movant's delay excusable, we would encourage candidates to wait until the last minute to bring constitutional challenges to state election laws. Once a candidate learned he had been denied a place on the ballot, he would take his disappointment to the courthouse and hapless state election boards would be forced to halt their scheduled election processes to wait for a ruling. Challenges that came immediately before or immediately after the preparation and printing of ballots would be particularly disruptive and costly for state governments. See Dobson v. Dunlap, 576 F. Supp. 2d 181, 187 (D. Me. 2008) (applying laches to bar a constitutional challenge to a state election law after noting that the state had "invested approximately 225 person hours in designing, preparing and proofing the paper ballots"). "[T]here must be a substantial regulation of elections if . . . some sort of order, rather than chaos, is to accompany the democratic processes," Anderson v. Celebrezze, 460 U.S. 780, 788 (1983), and we are loath to reach a result that would only precipitate a more disorderly presidential nominating process.

What is more, by permitting candidates to wait until after the ballot has been set to bring their challenges, we would perforce leave to utter speculation the question of whether any legal foundation exists for the ultimate remedy of adding a candidate's name to the ballot. The belated nature of Movant's suit, for instance, makes it all the more difficult to determine with any confidence whether a particular injury is even traceable to the allegedly unconstitutional residency requirement. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 590 (1992) (holding that in order to demonstrate standing, a plaintiff must allege that its injury is "fairly traceable to the defendant's allegedly unlawful conduct"). Movant failed to submit petitions containing at least 10,000 signatures to the Board under section 24.2-545(B) of the Virginia Code, a requirement the district court noted would pass muster "even under the strict scrutiny standard." While Movant of course predicts that he would have met the 10,000 signature threshold if only he had been allowed to use non-Virginia residents to gather signatures, such counterfactual speculation is not the office of the federal judiciary. We have no inkling as to whether Movant would have actually been able to secure 10,000 signatures, even if non-Virginia residents were able to circulate his petitions. Inviting delayed challenges like the one before us today would leave this court with only the most

15

infirm evidentiary basis upon which to grant the relief requested.

Sanctioning Movant's delay would not only necessitate such speculation, it would also require federal courts to select which candidates to place on state election ballots without appropriate legal guidance. Here, Movant and Intervenors are not similarly situated with respect to the numeric signature requirement. In the district court proceedings, Movant claimed to have submitted more than 6,000 signatures, whereas Intervenor Santorum claimed to have submitted more than 8,000. Intervenor Gingrich, by contrast, claimed to have submitted 11,050 signatures, less than 10,000 of which were deemed valid by the Board. And Intervenor Huntsman, whose candidacy has now been withdrawn, did not submit any signatures to the Board or even submit a Declaration of Candidacy. If we were to grant relief in these sorts of cases at all, we might be forced into the unenviable enterprise of trying to decide which parties are more deserving than others for purposes of ballot placement. The basis in law on which we would pick and choose among disparately situated candidates is utterly unclear to us, and yet such is the predicament into which the absence of any timely initiation of legal action seeks to place the court. It is of course the function of state electoral requirements to avoid just such eventualities, and the Movant's delay in challenging these

16

established election requirements fails to exhibit the necessary diligence.  See, e.g., Fulani v. Hogsett, 917 F.2d 1028, 1031 (7th Cir. 1990) (citing Williams v. Rhodes, 393 U.S. 23, 34-35 (1968) ("[A]ny claim against a state electoral procedure must be expressed expeditiously.")).

B.

With respect to the second prong of the laches defense, Movant asserts that the district court erred in determining that respondents were prejudiced by any delay on his part.  We find Movant's argument unpersuasive.  His lack of diligence clearly prejudiced the respondents, whose planning has been thrown into far greater confusion than would have been the case with a timely legal action.  Ballots and elections do not magically materialize.  They require planning, preparation, and studious attention to detail if the fairness and integrity of the electoral process is to be observed.

Virginia has 134 electoral jurisdictions, which administer elections based on guidelines implemented by the Board.  Each locality must print its own ballots, which must be approved by the Board.  See Perry v. Judd, No. 3:11-CV-856-JAG, slip op. at 1-2, 4 (E.D. Va. Jan. 10, 2012); Declaration of Don Palmer at 2 (Jan. 10, 2012).  As the district court noted, "Don Palmer, the Secretary of the State Board of Elections, testified without contradiction that printing ballots is complex and requires a

17

number of technical steps to imbed information into the ballots themselves and to program computers to count them."

In order to promote fair and efficient elections, the Board sets a timetable for localities to design ballots, order them from printers, proofread mock-ups, and mail them out. For the 2012 presidential primary, the Board allowed candidates to begin circulating petitions to obtain the requisite 10,000 signatures on July 1, 2011. The candidates were instructed to submit their signature petitions by December 22, and by December 27 the party chairmen were to certify the names of candidates qualified to appear on the ballot. On December 28, the Board was to determine the order of the names on the ballot by lot.

Under federal and state law, the Board and the localities must prepare and mail absentee ballots to military and overseas voters at least 45 days before the election. 42 U.S.C. § 1973ff-1(a)(8)(A); Va. Code. Ann. § 24.2-612. The Board is also bound by a consent decree to supervise all Virginia electoral jurisdictions and mandate full compliance with the 45-day requirement. The Republican primary election is to be held on March 6, 2012, making January 21, 2012 the deadline for compliance. Because January 21 is a Saturday, most electoral boards will mail absentee ballots by Friday, January 20.

The 45-day requirement provides the Board and localities with a tight window for getting ballots printed and mailed. To

18

meet this deadline, the Board set January 9, 2012 as the target date for localities to complete the preparations for printing of ballots. Accordingly, before the January 13 preliminary injunction hearing was even held, nearly all of the 134 election jurisdictions had already submitted their ballot proofs to the Board for approval. Declaration of Don Palmer at 2 (Jan. 10, 2012). In addition, the Board had already approved these ballots, and based on that approval, nearly all of the localities had already given their printer permission to print them. Id. Moreover, jurisdictions that use voting machines for in-person absentee voting had already employed third party vendors to program these machines. Id. at 3.

Given these undisputed facts, respondents have clearly suffered prejudice due to Movant's lack of diligence. Movant has already disrupted the Board's carefully planned schedule for meeting the demanding 45-day requirement, creating confusion for election officials across the state. In addition, because most of the printing has already been authorized or completed, Movant's requested relief would force expensive reprinting of ballots. Such reprinting -- not to mention other delays caused by the pending litigation -- would likely prevent respondents from complying with their obligations under federal and state law. Moreover, where absentee ballots are mailed in accordance with the January 21 deadline and where a federal court

19

subsequently granted the requested relief, officials would have to send a second and different ballot to each voter, which would risk confusion on the part of those voters and increase the cost and difficulty of administering the election.

In a strict sense, the prejudice caused by Movant's delay is to the respondents alone, but in a broad sense, the public is potentially prejudiced as well, as respondents are charged with ensuring the uniformity, fairness, accuracy, and integrity of Virginia elections. This is a state interest the Supreme Court has repeatedly credited. See, e.g., Clements v. Fashing, 457 U.S. 957, 965 (1982) ("States have important interests in protecting the integrity of their political processes [and] in ensuring that their election processes are efficient . . . ."); Jenness v. Fortson, 403 U.S. 431, 442 (1971). Both the ballot access requirements and 45-day mailing requirement were enacted to advance this important interest. In filing at this late hour, so close to the 45-day period, Movant has come perilously close to asking the federal courts to have state officials act in disregard of federal law.

The Supreme Court has repeatedly expressed its disapproval of such disruptions. In fact, applications for a preliminary injunction granting ballot access have been consistently denied when they threaten to disrupt an orderly election. Fishman v. Schaffer, 429 U.S. 1325, 1330 (1976) (Marshall, J., Circuit

20

Justice) (denying ballot access injunction in part on the ground that "applicants delayed unnecessarily in commencing [the] suit" until "[t]he Presidential and overseas ballots have already been printed; some have been distributed[, and t]he general absentee ballots are currently being printed."); Westermann v. Nelson, 409 U.S. 1236, 1236-37 (1972) (Douglas, J., Circuit Justice) (denying injunction "not because the cause lacks merit but because orderly election processes would likely be disrupted by so late an action."); see also Williams v. Rhodes, 393 U.S. 23, 34-35 (1968) (denying a political party's ballot access request, despite the unconstitutionality of the relevant statute, because "relief cannot be granted without serious disruption of election process").

These are not just caution lights to lower federal courts; they are sirens.[2] Consistent with such admonitions from the Supreme Court, we decline to disrupt an orderly election process by granting Movant's belated request for relief. Respondents

---

[2] And the Court's message has not been lost on our sister circuits, which have repeatedly denied similar requests for injunctive relief. See, e.g., Fulani v. Hogsett, 917 F.2d 1028, 1031 (7th Cir. 1990) (finding laches barred Movant's claim where Movant waited eleven weeks to file suit as election approached); Kay v. Austin, 621 F.2d 809, 813 (6th Cir. 1980) ("As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the candidate's claim to be a serious candidate who has received a serious injury becomes less credible by his having slept on his rights.").

have demonstrated that they were prejudiced by Movant's lack of diligence. Consequently, the district court did not err in concluding that laches bars Movant's motion for a preliminary injunction.

III.

We find no abuse of discretion on the part of the district court in denying this motion for a preliminary injunction on the basis of the equitable doctrine of laches. It is too late in the day to grant Movant's requested emergency relief upon appeal. We do not address in any fashion the merits of Movant's constitutional challenge to Virginia's circulator residency requirement because as the district court noted, "a decision on laches resolves the motion" due to the fact that it operates as an affirmative defense. For even if we assumed for purposes of argument that the residency requirement violated the First Amendment, laches would still preclude us from granting the emergency relief that Movant seeks. For the reasons expressed herein, the court denies Movant's request for an injunction ordering respondents either to place his name on the ballot or to refrain from printing or mailing ballots until the conclusion of these proceedings. The motion is accordingly hereby

DENIED.