In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

Nos. 14-2058 & 14-2059

RUTHELLE FRANK, *et al.*,

*Plaintiffs-Appellees*,

*v.*

SCOTT WALKER, Governor of Wisconsin, *et al.*,

*Defendants-Appellants*.

———————————

LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) OF
WISCONSIN, *et al.*,

*Plaintiffs-Appellees*,

*v.*

DAVID G. DEININGER, Member, Government Accountability
Board, *et al.*,

*Defendants-Appellants*.

———————————

On Motion for Reconsideration.

———————————

DECIDED SEPTEMBER 26, 2014 —

OPINIONS ISSUED SEPTEMBER 30, 2014

———————————

Before EASTERBROOK, SYKES, and TINDER, *Circuit Judges*.

PER CURIAM. Last April a district court enjoined the application of 2011 Wis. Act 23, which requires a photo ID for voting, even though Wisconsin's law is comparable to Indiana's, which the Supreme Court upheld in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008). After the district court's decision, the Supreme Court of Wisconsin reversed two similar injunctions issued by state courts but ordered state officials to make it easier for registered voters to obtain documentation (such as birth certificates) that they may need to obtain photo IDs, or to waive the documentation requirement if obtaining birth certificates proves difficult or expensive. *League of Women Voters v. Walker*, 2014 WI 97 (July 31, 2014); *Milwaukee Branch of NAACP v. Walker*, 2014 WI 98 (July 31, 2014). With the state injunctions lifted, Wisconsin asked us to stay the federal injunction so that it could use the photo ID requirement in this fall's election. After receiving briefs and hearing oral argument on the merits of the state's appeal, we granted the motion for a stay. Plaintiffs ask us to reconsider that decision.

When a court is asked to issue a stay, the first and most important question is whether the applicant has made a strong showing that it is likely to succeed on the merits. See, e.g., *Nken v. Holder*, 556 U.S. 418, 434 (2009). We thought this standard satisfied, given *Crawford*, *League of Women Voters*, and *Milwaukee Branch of NAACP*. None of these decisions is dispositive, because the district judge made findings of fact different from those that the Supreme Court of the United States and the Supreme Court of Wisconsin had before them. But those decisions give Wisconsin a strong prospect of success on appeal.

A second important consideration is the public interest in using laws enacted through the democratic process, until the laws' validity has been finally determined. This is the view the Supreme Court has taken in the same-sex-marriage cases now before it. Even after federal courts held some states' laws invalid, the Court issued stays so that the laws remain in effect pending final resolution. See *McQuigg v. Bostic*, No. 14A196 (S. Ct. Aug. 20, 2014); *Herbert v. Evans*, No. 14A65 (S. Ct. July 18, 2014). This court has followed the same approach for Wisconsin's and Indiana's marriage laws. After holding them unconstitutional, see *Baskin v. Bogan*, No. 14-2386 (7th Cir. Sept. 4, 2014), we nonetheless issued stays so that they could remain in force pending final decision by the Supreme Court. Our panel concluded that Wisconsin's photo ID law should be handled in the same way. Indiana has required photo ID at every election since 2005; it is hard to see why Wisconsin cannot do the same, while the validity of its statute remains under review.

Plaintiffs' motion for reconsideration asserts that the stay "imposes a radical, last-minute change" in election procedures and "virtually guarantees substantial chaos", contrary to decisions such as *Purcell v. Gonzalez*, 549 U.S. 1 (2006). Plaintiffs tell us that the state's election officials will be unable to prepare properly during the 53 days between the stay (September 12, 2014) and the next election (November 4, 2014). This overlooks the fact that the state's election officials themselves asked for the stay. Whether 53 days (more than seven weeks) is long enough to make changes is a question of fact on which the record in this litigation is silent. Plaintiffs have offered their beliefs, which undoubtedly are sincerely held, but not evidence.

Act 23 was enacted in May 2011, and only persons with photo ID were allowed to vote in the February 2012 primary election. The procedures having been formulated, and voters having had time to get qualifying IDs, the state would have continued to enforce Act 23, but for two injunctions (since reversed) issued by state judges after the February 2012 primary. Wisconsin therefore is not starting from scratch in September 2014. It would be extraordinary for a federal court to tell state officials that they are *forbidden* to implement a state law, just because federal judges predict that they will turn out to be wrong in thinking that 7+ weeks, plus work done between May 2011 and the district court's injunction in April 2014, is enough.

The stay this court has issued does not "impose" any change. It lifts a federal prohibition and permits state officials to proceed as state law allows or requires. Our order of September 12 was explicit: "The State of Wisconsin may, if it wishes (and if it is appropriate under rules of state law), enforce the photo ID requirement in this November's elections." If seven weeks is too short, then state officials need not make any change; nothing has been "imposed" on them. Whether to use the photo ID requirement, in the absence of a federal injunction, is a matter of state law, for determination by Wisconsin's executive and judicial branches. Wisconsin could decide, for example, that it would be too cumbersome to implement the change with respect to this year's absentee ballots, but not with respect to live voting in November. Our decision does not foreclose such a possibility.

*Purcell*, on which plaintiffs rely, dealt with a judicial order, issued less than five weeks before an election, forbidding use of Arizona's voter ID requirement. Without giving

reasons, the Ninth Circuit required a state to depart from procedures established by state law; the Supreme Court held this to be improper. (The court of appeals later held that Arizona's ID requirement is valid, reinforcing the conclusion that it had been a mistake to enjoin it. See *Gonzalez v. Arizona*, 677 F.3d 383, 404–10 (9th Cir. 2012) (en banc).) In this case, by contrast, the court has not compelled the state to do anything; instead it has permitted the state to enforce a statute that the state tells us it wants (and is able) to enforce. There is a profound difference between compelling a state to depart from its rules close to the election (*Purcell*) and allowing a state to implement its own statutes (this case).

According to plaintiffs, equitable considerations favor leaving the injunction in force because many voters who today lack acceptable photo IDs will be unable to get them before November's election. Yet Act 23 was enacted in May 2011. Voters in Wisconsin who did not already have a document that Wisconsin accepts (a driver's license, for example) have had more than three years to get one. The statute gave voters eight months to acquire necessary documents before Act 23's first implementation (in the February 2012 primary); a further two years and nine months will have passed by this fall's election.

The district judge did not find that any particular number of registered voters in Wisconsin has tried, but been unable, to obtain one of the several kinds of photo ID that Wisconsin will accept at the polls. The judge did observe that eight persons testified that they had tried and failed but did not decide whether their experience is representative, or even whether their testimony was accurate. After the district court's decision, the Supreme Court of Wisconsin fixed the

problems these eight said they had encountered. The number of registered voters without a qualifying photo ID (which the judge estimated at 300,000, or 9% of the 3,318,000 total) thus appears to reflect how many persons have not taken the necessary time, rather than a number of persons who have been disfranchised. We do not apply the label "disfranchised" to someone who has elected not to register, even though that step also requires an investment of time. In Wisconsin approximately 78% of those eligible have registered to vote, and approximately 74% of those who did register cast votes in the last presidential election. Both figures are lower than the 91% who already possess acceptable photo IDs, yet no one infers from the 78% registration proportion or the 74% voting proportion that Wisconsin has disfranchised anyone.

*Crawford* concluded that requiring would-be voters to spend time to obtain photographic identification does not violate the Constitution. "For most voters who need them, the inconvenience of making a trip to the [department of motor vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 553 U.S. at 198. The burden of getting a photo ID in Wisconsin is not materially different from the burden that *Crawford* deemed acceptable.

The motion for reconsideration is denied.

A judge called for a vote on the request for a hearing en banc. That request is denied by an equally divided court. Chief Judge Wood and Judges Posner, Rovner, Williams, and Hamilton voted to hear this matter en banc.

WILLIAMS, *Circuit Judge*, with whom WOOD, *Chief Judge*, and POSNER, ROVNER, and HAMILTON, *Circuit Judges*, join, dissenting from the denial of rehearing en banc. After absentee ballots had already been mailed and then returned with ballots cast, and with this November's elections fast approaching, the panel issued an order staying the district court's injunction and authorizing Wisconsin to require voter identification in elections that are only weeks away. Our court should not have altered the status quo in Wisconsin so soon before its elections. And that is true whatever one's view on the merits of the case. Our stay order was improper, and it should not stand.

This stay will substantially injure numerous registered voters in Wisconsin, and the public at large, with no appreciable benefit to the state. *Cf. Nken v. Holder*, 556 U.S. 418, 434 (2009) (providing factors court is to consider when deciding whether to issue stay: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies). To alter the status quo so soon before an election, and with the state's "election machinery already in progress," *Reynolds v. Sims*, 377 U.S. 533, 585 (U.S. 1964), will have significant impact. The district court found that 300,000 registered voters—*registered voters*, not just persons eligible to vote—lack the most common form of identification needed to vote in the upcoming elections in Wisconsin. (To put this number in context, the 2010 governor's race in Wisconsin was decided by 124,638 votes and the election for United States Senator by 105,041 votes.) And how does the state reply to the fact that numerous *regis-*

*tered voters* do not have qualifying identification with elections so imminent? It brazenly responds that the district court found that "more than 90% of Wisconsin's registered voters already have a qualifying ID" and can vote and that "the voter ID law will have little impact on the vast majority of voters." But the right to vote is not the province of just the majority. It is not just held by those who have cars and so already have driver's licenses and by those who travel and so already have passports. The right to vote is also held, and held equally, by all citizens of voting age. It simply cannot be the answer to say that 90% of registered voters can still vote. To say that is to accept the disenfranchisement of 10% of a state's registered voters; for the state to take this position is shocking.

It is simply impossible—as a matter of common sense and of logistics—that hundreds of thousands of Wisconsin's voters will both learn about the need for photo identification and obtain the requisite identification in the next 36 days (26 business days). Doing so would require the state to issue around 6,000 photo identifications per day up to the election. Yet obtaining the necessary identification can take months for voters who were born outside Wisconsin and who lack birth certificates. Make no mistake, that is no small number of the registered voters at issue. *See Frank v. Walker*, 2014 WL 1775432, at *13 (E.D. Wis. 2014) (nearly 50% of eligible voters in Milwaukee County who lack both accepted photo identification and valid birth certificate were born outside Wisconsin). And for the registered voter in Wisconsin lucky enough to already have all the documents who must then get identification through the Department of Motor Vehicles, most DMV offices in Wisconsin are only open two days a week (and these are weekdays, not weekends).

Those thousands of absentee ballots that were mailed to voters before the panel's order? They do not count when returned in the manner their instructions direct, for they do not comply with the Wisconsin voter identification law. That is true for the absentee ballots that voters had already sent back in before the panel's order, and any returned from here until the election. *Cf. Nader v. Blackwell*, 230 F.3d 833, 834-35 (6th Cir. 2000) (improper to change party-identification procedures after absentee ballots already mailed); *Perry v. Judd*, 471 Fed. Appx. 219, 227 (4th Cir. Jan. 17, 2012) (unpublished) (changing rules after absentee ballots printed would be improper).

Changing the rules so soon before the election is contrary not just to the practical realities of an impending election, but it is inconsistent with the Supreme Court's approach to such cases. In *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), for example, the district court had declined to enjoin a voter ID law, but then the Ninth Circuit issued an emergency stay. The Supreme Court unanimously reversed the appellate court's last-minute reversal of the district court. It cautioned that court orders affecting elections can lead to "voter confusion and consequent incentive to remain away from the polls," and it said that this risk increases as an election draws closer. *Id.* at 4-5. *Purcell* was not the first time the Court recognized these realities. *See, e.g., Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968) (denying requested relief, despite unconstitutionality of statute, because "the confusion that would attend such a last-minute change poses a risk of interference with the rights of other Ohio citizens" and "relief cannot be granted without serious disruption of election process"); *Reynolds*, 377 U.S. at 585 ("where an impending election is imminent and a State's election machinery is al-

ready in process, equitable considerations might justify a court in withholding the granting of immediately effective relief"); *see also Westermann v. Nelson*, 409 U.S. 1236, 1236-37 (1972) (Douglas, J., in chambers) (denying request to have candidate's name printed on ballot where absentee ballots had already been sent and returned even though "[t]he complaint may have merit" because "the time element is short," the "election machinery is already underway," and "orderly election processes would likely be disrupted by so late an action"). Here, too, the status quo before the panel's order should be restored—the status quo that all in Wisconsin had been operating under, and the status quo that if not restored will irreparably harm registered voters in Wisconsin. We, as "the Court of Appeals," are "required to weigh … considerations specific to election cases," and to "give deference to the discretion of the District Court," and we must do this because the Supreme Court tells us to. *Purcell*, 549 U.S. at 4. Weighing those considerations properly here would mean the stay would not stand.

A full discussion on the merits will wait for another day, but a likelihood of success on the merits is one factor in the stay decision, *see Nken*, 556 U.S. at 434, and the panel's grant of the stay seems premised on a conclusion that the state is likely to succeed on the merits in light of *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008). That premise is dead wrong. The Supreme Court opinion in *Crawford* made very clear that its decision was specific to the evidence in the record in that case. Or, to be more precise, to the complete and utter lack of evidence. The Court pointed out that the district court there found that the petitioners "had 'not introduced evidence of a single, individual Indiana resident who will be unable to vote as a result of [Indiana's voter

identification law] or who will have his or her right to vote unduly burdened by its requirements.'" *Id.* at 187 (plurality opinion of Stevens, J.) (quoting *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 783 (S.D. Ind. 2006)). It noted the district court's emphatic rejection of the plaintiffs' expert report, *id.*, and stated that the record did not even contain the number of registered voters in Indiana without voter identification, *id.* at 200. The Court found that "the deposition evidence presented in the District Court does not provide any concrete evidence of the burden imposed on voters who currently lack photo identification," *id.* at 201, and stated that "[t]he record says virtually nothing about the difficulties faced by either indigent voters or voters with religious objections to being photographed," *id.* The single affidavit of one woman who was denied photo identification because she did not have an address, said the Court, "gives no indication of how common the problem is." *Id.* at 202. And so it was no surprise that the Court concluded that "the evidence in the record is not sufficient to support a facial attack on the validity of the entire statute." *Id.* at 189. The Court reiterated that it was deciding the case based on the record before it at the end of its analysis, too, stating, "In sum, on the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes 'excessively burdensome requirements' on any one class of voters." *Id.* at 202.

The record that has been made in this litigation is entirely different from that made in *Crawford*. In every way. The plaintiffs put on detailed evidence of the substantial burdens Wisconsin's voter identification law imposes on numerous voters. They put on multiple witnesses. They put on qualified experts. They made this a record-heavy case. And after hearing the voluminous evidence presented to the federal

district court in Wisconsin, the experienced judge concluded that Wisconsin's voter identification law had a disproportionate impact on African Americans and Latinos, was unconstitutional, and violated the Voting Rights Act. (Note also that while the panel's order called the Wisconsin and Indiana laws "materially identical," the Wisconsin law does not have an affidavit option that allows indigent voters without identification to vote provisionally as the Indiana law at issue in *Crawford* did. *Cf. Crawford*, 553 U.S. at 185-86 ("The severity of that burden is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted" if affidavit executed at clerk's office within ten days); *see* Ind. Code § 3-11.75-5-2.5(c).) *Crawford* simply does not direct a victory to the state in this case.

Nor will the state be irreparably injured absent a stay. The Supreme Court has said that irreparable harm to the party seeking the stay is one of the two "most critical" factors in deciding whether to issue a stay, *Nken*, 556 U.S. at 434, yet it is very hard to see any irreparable harm to the state. The state has conducted hundreds of elections without a voter identification requirement. It had been preparing for months to do the same again. (Indeed, the voter identification law was designed to have a rollout period of 8 months before a primary and 16 months before a general election—not mere weeks.) The state has not pointed to a single instance of an in-person impersonation at the polling place in any of these elections. Waiting until the 2016 election for the state to implement whatever law is in place on the merits will give it plenty of time to properly implement that law.

Moreover, that stays were issued in same-sex marriage cases means nothing for this eve-of-election case. The uncertainty, confusion, and long-term harm that would result from allowing thousands of marriages that are valid for a time but might later be wiped away led to stays in those cases.[1] (And of course there is no presumption against enjoining unconstitutional state laws pending appeals, lest the panel opinion leave a contrary impression.) The scale balancing the harms here, on the other hand, is firmly weighted down by the harm to the plaintiffs. Should Wisconsin citizens not have their votes heard, the harm done is irreversible. And as the district court found, for many voters without qualifying identification, the burdens associated with obtaining such identification "will be anything but minor" and will deter a substantial number of eligible voters from voting. On the other side of the scale is the state's interest in guarding against a problem it does not have and has never had. The state can wait one more election to implement its law if it is found to be constitutional.

Our court should not accept, as the state is willing to do, the disenfranchisement of up to 10% of Wisconsin's registered voters. We certainly should not do so when there is no evidence in Wisconsin whatsoever of the type of fraud the

---

[1] Take Utah's experience, for example, where the Tenth Circuit did not initially issue a stay. Over 1,000 same-sex couples obtained marriage licenses after the district court enjoined the state's law. Jessica Miller, *10th Circuit Court: Utah's Same-Sex Marriage Ban Is Unconstitutional*, June 26, 2014, *available at* http://www.sltrib.com/sltrib/news/58114139-78/marriage-court-utah-sex.html.csp. The Supreme Court stayed the district court's injunction, the law against same-sex marriage went back into effect, and now those couples are in limbo as to the validity of their marriage licenses. *See Herbert v. Evans*, No. 14A65 (S. Ct. July 18, 2014).

law is designed to prevent against. Our court should not have altered the status quo in Wisconsin so soon before its elections. The district court's injunction against the implementation of the Wisconsin law should remain in place, and the panel's order lifting that injunction should be revoked.