# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-IA-00148-SCT

*DR. WILLIE WILSON*

*v.*

*DELBERT HOSEMANN, IN HIS CAPACITY AS*
*MISSISSIPPI SECRETARY OF STATE*

## ON THE SECRETARY OF STATE'S MOTION TO RECALL THE MANDATE; MOTION TO ALTER OR AMEND THE JUDGMENT OR FOR OTHER NECESSARY RELIEF

| | |
|---|---|
| DATE OF JUDGMENT: | 02/03/2016 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | SAMUEL L. BEGLEY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: HAROLD E. PIZZETTA, III |
| NATURE OF THE CASE: | CIVIL |
| DISPOSITION: | REVERSED AND RENDERED - 02/26/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2016-EC-00163-SCT

*DR. WILLIE WILSON*

*v.*

*DELBERT HOSEMANN, IN HIS CAPACITY AS*
*MISSISSIPPI SECRETARY OF STATE*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/03/2016 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | SAMUEL L. BEGLEY |

ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
 BY: HAROLD E. PIZZETTA, III

NATURE OF THE CASE: CIVIL
DISPOSITION: REVERSED AND RENDERED - 02/26/2016
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**DICKINSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The Motion to Recall the Mandate is granted, the Motion to Alter or Amend the Judgment or For Other Necessary Relief is granted in part, this Court's prior opinion is withdrawn, this opinion is substituted in its place, and the remainder of the Motion to Alter or Amend the Judgment or For Other Necessary Relief is stricken.

¶2. Dr. Willie Wilson timely submitted his petition and qualification papers to the Mississippi State Democratic Executive Committee (the "Party"), to run for President in the 2016 Democratic primary. The Party rejected Dr. Wilson's petition but later reconsidered and requested the Mississippi Secretary of State to place Dr. Wilson's name on the primary ballot. But, because absentee and overseas military voting had already begun, the Secretary of State refused. The Circuit Court of Hinds County refused to grant Dr. Wilson an injunction and he appealed. Under the particular facts and circumstances of this case, we find that Dr. Wilson's due process rights were violated, so we reverse and render.

FACTS AND PROCEDURAL HISTORY

*The Presidential Primary Ballot Process*

¶3. The names of individuals who wish to participate in a political party's presidential preference primary election are placed on the ballot in two ways. First, Mississippi law

2

requires the Secretary of State to include all candidates who are "generally recognized throughout the United States or Mississippi as [candidates] for the nomination of President of the United States."[1] The Secretary must announce those candidates on or before December 15 in the year preceding the presidential election, and he may continue to add names thereafter.[2]

¶4. Others who wish their names to appear on the primary ballots may file petitions with that party's state executive committee between January 1 and January 15 of the presidential election year.[3] Their petitions must be

> signed by a total of not less than five hundred (500) qualified electors of the state, or . . . signed by not less than one hundred (100) qualified electors of each congressional district of the state.[4]

Then, no more than two working days following the qualifying deadline—this year by January 19—the party must submit the names of qualified candidates to the Secretary of State to be added to the State's electronic Statewide Election Management System.[5] Rather than notifying Dr. Wilson prior to the January 19 deadline, the Party waited until 1:04 p.m. on January 20—one day after the deadline had passed—to notify him that his petition had been rejected. So, strictly applying the statutes without reading into them any grace period, the Party did not inform Dr. Wilson that he had not qualified until after the statutory deadline to

---

[1] Miss. Code. Ann. § 23-15-1089 (Rev. 2015).

[2] *Id.*

[3] Miss. Code Ann. § 23-15-1093 (Rev. 2015).

[4] *Id.*

[5] Miss. Code Ann. § 23-15-296 (Rev. 2015).

submit his name had passed and he had lost the opportunity to timely contest the Party's decision.

¶5.     Three days later, absentee voting began, and the  Secretary of State was required by federal law to have mailed ballots to members of the military overseas by that time.[6]  So, even had the Secretary of State ignored the January 19 deadline—again, for which Mississippi law provides no exception— Dr. Wilson had only from 1:04 p.m. on Wednesday, January 20, to some time on Friday, January 22, the day ballots were prepared and printed for distribution and mailing the following day, to have the Party correct its mistake and notify the Secretary of State that his name should be included on the ballot.  It is this two-day window of time that is the focus of the case before us today.

### Dr. Wilson's Efforts to Have His Name Appear on the Democratic Primary Ballot

¶6.     Dr. Wilson's name was not among those placed on the ballot by the Secretary of State as a candidate generally recognized throughout the United States or Mississippi.  So, on January 14, 2016, he timely filed with the Mississippi Democratic Party a petition to have his name added to the ballot.  His petition complied in every respect with Mississippi law.  But on January 19—the statutory deadline for the Party to submit names of qualified candidates to the Secretary of State—the Party informed the Secretary of State that Dr. Wilson had not

---

[6] "Each State shall . . . transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . in the case in which the request is received at least 45 days before an election for Federal office, not later than 45 days before the election."  52 U.S.C.A. § 20302(a)(8)(A).

4

qualified.[7] Rather than informing Dr. Wilson that same day that he had been rejected, the Party waited until 1:04 p.m. on the following day—January 20—to advise him that his petition had been rejected.

¶7.     The very next day—Thursday—Dr. Wilson (a resident of Chicago, Illinois) located and retained an attorney who appealed to the Party to reconsider its incorrect decision. The party admitted its mistake to Dr. Wilson's attorney on Monday, January 25—three days after the deadline to inform the Secretary of State to halt the presses and add Dr. Wilson's name to the ballot.

¶8.     Although the Party notified Dr. Wilson of its mistake, it did not notify the Secretary of State, so on Wednesday, January 27—eight days after the Secretary of State's deadline, and five days after the deadline to correct mistakes—Dr. Wilson's attorney threatened a lawsuit, and the Party responded by hand-delivering a letter to the Secretary of State, stating that Dr. Wilson had submitted a qualifying petition and asking that his name be included on the ballot. As a result of his successful appeal to the Party to change its decision, Dr. Wilson's counsel also emailed the Secretary of State's office that day asking that his name be added to the ballot.

¶9.     Two days later—January 29—the Secretary of State's office informed the Party that it would not add Dr. Wilson's name to the ballot because the Party had failed to submit his

---

[7] Although Dr. Wilson's petition contained more than double the 500 signatures required by statute, the Party rejected it because it did not include 100 signatures from each congressional district, as required by the Party's Delegate Selection Plan—a requirement that contradicted Mississippi law and had been rejected by an Attorney General opinion on June 5, 2015. Miss. Op. Att'y Gen., No. 2015-00158, 2015 WL 4394179 (June 5. 2015).

5

name by the January 19 deadline, as required by law,[8] and because sample ballots had been issued and absentee voting had begun.

### *The Litigation*

¶10. That afternoon, Dr. Wilson filed a complaint in the Hinds County Circuit Court, seeking a writ of mandamus, as well as declaratory and injunctive relief, ordering the Secretary of State to add his name to the ballot. Dr. Wilson also filed a motion for preliminary injunction, requesting the same relief and asserting that his name constitutionally could not be excluded from the ballot.[9] On February 1, Dr. Wilson filed an amended complaint, adding his argument that his constitutional rights to due process, freedom of speech, and freedom of association were violated. The Secretary of State responded, arguing that state and federal statutory deadlines precluded the Secretary of State from adding Dr. Wilson's name to the ballot.

¶11. On February 1, the parties appeared for a hearing in the circuit court on Dr. Wilson's motion for preliminary injunction. At the end of the hearing, the circuit judge stated that he would email his ruling that afternoon with a written order to follow. Later that afternoon he sent the parties an email stating:

---

[8] Miss. Code Ann. § 23-15-296.

[9] Dr. Wilson has expressly waived any claim that his name should be added to absentee ballots. In his petition for interlocutory appeal, Dr. Wilson stated "[t]he Appellant waives any right he might have to challenge any military or absentee ballots that have been cast or have been mailed to be completed and returned to the county circuit clerks, on account of his name not appearing on such ballots." At oral argument, Dr. Wilson's counsel reiterated that Dr. Wilson seeks an order that the Secretary of State add his name to the electronic Statewide Election Management System.

6

The Court, after a review of this matter, finds that the Motion for Preliminary Injunction is not well taken and will be denied. Voting in the Democratic presidential primary began on January 23, 2016. Prior to initializing the voting process, the Secretary of State was advised by the Democratic party that Dr. Wilson did not qualify. Therefore, the Secretary of State, in accordance with statutory law, finalized ballots and, on January 23, voting began. It is too late to repeat the process. Any such change in this process would be in violation of the statutory deadlines set forth in Mississippi and federal law. The plaintiff has not met the requirements for a preliminary injunction and the same is hereby denied.

¶12. So the next day—February 2—Dr. Wilson filed a notice of appeal, and the following day—February 3—he filed a "Petition for Expedited and Emergency Consideration of Appeal, For Permission to Appeal of [sic] Interlocutory Order, and for Mandamus Adding Appellant's Name to the Ballot." This petition argued that the failure to add his name to the ballot violated both his constitutional rights and those of the signatories to his petition. On February 4, the circuit judge entered his written order, repeating his ruling from the email.

¶13. Dr. Wilson's appeal of the circuit court's order denying his motion for a preliminary injunction technically is interlocutory in nature. But applying our precedent in *Gibson v. Manuel*,[10] we find the circuit judge's order effectively "leaves the parties with little else to litigate" in the circuit court. So we grant Dr. Wilson's petition for interlocutory appeal, consolidate the records from the direct and interlocutory appeals, reverse and render judgment in Dr. Wilson's favor, order that the Secretary of State add Dr. Wilson's name to Mississippi's electronic Statewide Election Management System, and dismiss the direct appeal as moot.

**ANALYSIS**

[10] *Gibson v. Manuel*, 534 So. 2d 199, 200–1 (Miss. 1988).

7

¶14.    Dr. Wilson argues that, because he met the statutory requirements to qualify to run in the Mississippi Democratic Presidential Preference Primary Election, his due process and First Amendment rights—as well as those of the signatories to his qualifying petition—have been violated by the exclusion of his name from the ballot.  We conclude that the Party's failure to timely inform Dr. Wilson that it found his petition insufficient and to timely respond to his attorney's request to reconsider, coupled with the January 19 and 23 statutory deadlines to submit names and send ballots to overseas and military voters, denied Dr. Wilson a meaningful opportunity to be heard by the Party and deprived him of due process of law.

¶15.    In *Meeks v. Tallahatchie County*, we considered a political candidate's legal challenge to a political party's determination that he had not qualified to run for office.[11] There, Eddie Meeks sought the Democratic Party's nomination for justice court judge in Tallahatchie County.[12]  At the time, Meeks served as Chairman of the Tallahatchie County Elections Commission.[13]  At a meeting to consider candidate certification, the Tallahatchie County Democratic Party Elections Committee determined that Meeks was ineligible to run and refused to certify him as a candidate.[14]

---

[11] *Meeks v. Tallahatchie Cty.*, 513 So. 2d 563 (Miss. 1987).

[12] *Id.* at 564.

[13] *Id.*

[14] *Id.*

¶16. Meeks, upon hearing that the Party had voted to deny his certification, appeared before the committee and argued that he could be certified as a candidate.[15] The Party stood by its decision, and Meeks sought an order from the Tallahatchie County Circuit Court to have his name placed on the ballot.[16] The circuit judge denied relief and Meeks appealed.[17]

¶17. On appeal, in addressing Meeks's argument that the Party had denied him due process of law, we held:

> Without doubt, election to public office is a public function and any integral part of that function must be constitutional. The nomination process may appear to be more a private than a governmental function because it is conducted by political parties. Appearances notwithstanding, our law recognizes that the selection of party nominees by primary elections is an integral part of the entire election process. . . . [T]he primary election process is sufficiently state action that persons affected by it and participating in it have available due process protections.[18]

¶18. Applying that principle, we held that:

> [W]hen one files the proper qualifying papers and pays the requisite filing fee to become a candidate for public office, neither the state nor, in the case of a primary election, a political party may arbitrarily or capriciously deprive him or her of a place on the ballot. [The candidate is] entitled to due process protections on two levels. First, he [is] entitled to the opportunity to be heard.

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.* (citing *Fanning v. State*, 497 So. 2d 70, 72 (Miss. 1986); *Miss. State Bd. of Election Comm'rs v. Meredith*, 301 So. 2d 571, 573 (Miss.1974); *Terry v. Adams*, 345 U.S. 461, 73 S. Ct. 809, 97 L. Ed. 1152 (1953); *Smith v. Allwright*, 321 U.S. 649, 64 S. Ct. 757, 88 L. Ed. 987 (1944); *United States v. Classic*, 313 U.S. 299, 61 S. Ct. 1031, 85 L. Ed. 1368 (1941)).

Second, he [is] entitled that his name not be finally stricken from the ballot except that result be required by law.[19]

¶19. And we made it clear that:

[w]here the executive committee decides that a person is not eligible, however, and where that person wishes to be heard regarding the matter, the executive committee, as a matter of due process, is required to allow the disqualified candidate a reasonable opportunity to present his case.[20]

¶20. *Meeks* instructs us on Dr. Wilson's claim in two ways. First, because the Party initially determined his petition did not qualify him to run in the primary election, *Meeks* obligated the Party to provide Dr. Wilson "a reasonable opportunity to present his case."[21] That did not occur. And while the Party ultimately listened to Dr. Wilson's attorney and reversed its decision, it did so too late to provide meaningful due process protection.

¶21. Granting due process after it is too late is not due process. As the United States Supreme Court has explained, "[i]f the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time *when the deprivation can still be prevented*."[22] Here, as a result of extremely tight statutory deadlines and the Party's failure to timely reach a correct decision, Dr. Wilson was provided no such opportunity.

¶22. Dr. Wilson timely filed his petition one day early, on January 14. Under Section 23-15-296, the Mississippi Democratic Party had until Monday, January 19, to submit Dr.

---

[19] *Meeks*, 513 So. 2d at 565.

[20] *Id.*

[21] *Id.*

[22] *Fuentes v. Shevin*, 407 U.S. 67, 81, 92 S. Ct. 1983, 1994, 32 L. Ed. 2d 556 (1972) (emphasis added).

10

Wilson's name to the Secretary of State as a qualified candidate. Prior to that day, the Party provided Dr. Wilson no indication that it would deny his petition. On January 19, the Party informed the Secretary of State's office that one candidate—Roque De La Fuente—had qualified by petition, but that Dr. Wilson had not. The Party waited until 1:04 p.m. the following day to inform Dr. Wilson. At this point, when the Party first informed Dr. Wilson that his petition had been deemed inadequate, the statutory deadline to submit names for the ballot already had passed. In other words, Dr. Wilson was not "granted [an opportunity to be heard] at a time *when the deprivation can still be prevented*" because the Party did not inform Dr. Wilson that he had not qualified until after the statutory deadline to submit his name to the Secretary of State had passed.

¶23. Even then, Dr. Wilson took immediate action to correct the Party's error by hiring an attorney who, on January 22, presented his case to the Party. But rather than immediately reviewing the matter and reversing its decision in time to have the ballots corrected before mailing on January 23,[23] the Party once again denied Dr. Wilson a meaningful opportunity to be heard. The Party waited until Monday, January 25—after the ballots were mailed and absentee voting had begun—to admit its mistake to Dr. Wilson's attorney. And even then, the Party waited two more days to inform the Secretary of State.

---

[23] Once again, this assumes the Secretary of State would have ignored the January 19 deadline, which no Mississippi law permits him to do. Under Mississippi law, Dr. Wilson was deprived of due process when the January 19 deadline passed without his being provided an opportunity to present his case. We discuss Dr. Wilson's efforts after January 19 simply to illustrate that he diligently attempted to litigate his case as soon as the Party provided him an opportunity to do so.

11

¶24. So, in sum, *Meeks* required the Party to provide Dr. Wilson a meaningful opportunity to present his case. And in order for the opportunity to be meaningful, it must have occurred when the harm—leaving Dr. Wilson off the ballot—still could be remedied. The Party's delay, coupled with the January 19 and 23 deadlines, denied Dr. Wilson that chance. In other words, under *Meeks*, Dr. Wilson was denied due process of law.

¶25. But *Meeks* is instructive for a second reason. At oral argument, the attorney for the Secretary of State argued that when Dr. Wilson learned the Party had rejected his petition on Wednesday afternoon, he had until Friday afternoon to go into the court system; and that by not doing so, he waived any remedy to the violation of his constitutional rights.[24] Mississippi law holds otherwise.

¶26. As explained above, *Meeks* also involved a political party's determination that a candidate had not qualified for the primary.[25] There, discussing the candidate's challenge, this Court held:

> Where the executive committee decides that a person is not eligible, however, and where that person wishes to be heard regarding the matter, the executive committee, as a matter of due process, is required to allow the disqualified candidate a reasonable opportunity to present his case.[26]

---

[24] Although it is not dispositive in this case, we note here that it would require enormous optimism for one to conclude that Dr. Wilson (a Chicago resident) could hire Mississippi counsel who, in turn, could then research the law, gather evidence, draft pleadings, obtain a hearing and decision from the Hinds County Circuit Court and a reversal from this Court, all in approximately two days.

[25] *Meeks*, 513 So. 2d at 563.

[26] *Id.* at 565.

¶27. We certainly cannot now fault Dr. Wilson for following the very procedure that we articulated in *Meeks*. Also, Sections 23-15-923 and 23-15-961—both of which govern election contests and an opponent's challenge to a political party's eligibility determinations—require that a contesting candidate seek recourse with the party executive committee before seeking a judicial remedy. Section 23-15-1087 states that "[e]xcept as otherwise provided in this chapter, the laws regulating primary and general elections shall in so far as practical apply to and govern presidential preference primary elections." So, both caselaw and statutes required Dr. Wilson first to seek a remedy from the Party. He did so but was denied a meaningful opportunity to be heard.

¶28. Remarkably, the dissenting Justices—while conceding that Dr. Wilson's rights were violated—would provide him relief only had he ignored our precedent in *Meeks* and proceeded directly into the courts, or sought a "formal hearing" with the Party. Chief Justice Waller criticizes Dr. Wilson's counsel's efforts to persuade the Party to change its decision, labeling his attempts to "negotiate" and "work things out" as "haggling."[27] We find this criticism unjustified, particularly in light of counsel's immediate and concerted efforts to persuade the Party to change its decision in the two-day snippet of time available to him.

¶29. *Meeks* includes no requirement that counsel seek a "formal hearing." Indeed, the due process right addressed in *Meeks* is not the right to procedural formality, but rather the right

---

[27] Dr. Wilson's attempts to "haggle" with the Party were hardly "futile," as characterized by Chief Justice Waller's dissent. Dr. Wilson successfully persuaded the Party to change its decision.

to be heard in a meaningful way[28] at a time when redress can be provided.[29]  Dr. Wilson sought the opportunity to be heard—exactly as this Court required in *Meeks*.  As soon as he knew the Party had rejected his petition, he retained an attorney who immediately sought relief, first from the Party, and then from the courts.

¶30.  Further, Chief Justice Waller's dissent requirements of Dr. Wilson during the two-day period between January 20 and January 22 border on optimistic fantasy.  To suggest that Dr. Wilson's counsel was less than diligent—negligent, really—for not doing more than he did during that two-day time frame, strikes us as unfair for several reasons.

¶31.  First, the Party's actions and the statutory procedures for securing a place on the primary ballot provided Dr. Wilson no chance to do so.  The deadline for the Party to notify the Secretary of State of the names of qualified candidates was January 19, and that deadline passed before Dr. Wilson even received notice that the Party had rejected his petition.  Mississippi statutory law provides no exception for the January 19 deadline.  So no statutory remedy was available for Dr. Wilson—once he was rejected—ever to get on the ballot.

¶32.  The dissents' views that Dr. Wilson's counsel should have ignored *Meeks* and gone directly into the courts ignore the practical reality that, even had Dr. Wilson filed his

---

[28] *Id.* ("True, the hearing afforded Meeks was somewhat unorthodox in the sense that Meeks informally got word that the Committee was meeting, had acted negatively upon his candidacy, and that he then went uninvited to the meeting. No matter. What is important—indeed, outcome determinative—is that Meeks appeared before the Committee and fully presented his views and his case.").

[29] *Fuentes*, 407 U.S. at 81 ("If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time *when the deprivation can still be prevented*.") (emphasis added).

14

complaint on January 20, he still would not have been on the ballot by January 23. Dr. Wilson did not learn of his rejection until 1:04 p.m. on January 20. So, between 1:04 p.m. on Wednesday afternoon and sometime on Friday—in time to get to the printer—Dr. Wilson, who lives in Chicago, would have had to employ Mississippi counsel, file a complaint in the Hinds County Circuit Court, participate in a hearing, obtain the trial-court ruling, file an appeal, and have his appeal heard and decided by this Court. No member of this Court, nor the bench and bar at large, can believe this could have happened. So, even had Dr. Wilson skipped any attempt to have the Party change its decision and gone directly into the courts, the ballots still would have been mailed out on January 23 without his name, and we would be right where we are today.

¶33. The practical result of the dissenting justices' view of the requirements for a wrongfully rejected candidate to seek and obtain relief for a violation of his or her constitutional rights, would be effectively granting the power to political parties to prevent any person they desire from qualifying as a candidate.

¶34. We note that the dissent by Chief Justice Waller repeatedly states that "Dr. Willie Wilson waited until January 29, 2016, to raise a formal objection to the Secretary of State's refusal to place his name on the Democratic primary ballot." Since January 29 was the very day the Secretary of State refused to put Dr. Wilson's name on the ballot, we fail to see how he could have objected earlier.

¶35. The dissents' criticism of Dr. Wilson for not suing the Democratic Party deserves little attention. The Democratic Party could afford Dr. Wilson no remedy. It already had agreed

15

that Dr. Wilson's name should be on the ballot and had asked the Secretary of State—who controlled the electronic Statewide Election Management System—to add Dr. Wilson's name. Dr. Wilson's constitutional rights were violated, and he was entitled to file suit against the party in a position to grant him relief.

¶36. This is not unusual. For instance, in *Gideon v. Wainwright*—a landmark constitutional-law decision—Circuit Judge Robert McCrary violated Clarence Earl Gideon's constitutional rights by refusing to appoint him counsel. Gideon sought a remedy for the constitutional violation—not by suing Judge McCrary, who could provide him no remedy—but by suing the party who was in a position to provide him a remedy for the constitutional violation.[30]

¶37. And as a final note, we point out that the defendant in *Gideon*—the Secretary of the Florida Department of Corrections—was a proper defendant who lost in the litigation, even though he had followed all Florida statutes and United States Supreme Court precedent. So because only the Secretary of State could provide Dr. Wilson a remedy for the constitutional violation, we must reject the dissents' suggestion that he should have sued the Democratic Party.

¶38. Having concluded that Dr. Wilson was denied due process, we now must consider the appropriate remedy. In both this Court and the circuit court, Dr. Wilson has asked that the Secretary of State to be ordered to add his name to the State's electronic Statewide Election

---

[30] *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).

16

Management System. He has waived any right to challenge any ballot already printed or issued.

¶39. The Secretary of State, contending that we should grant no relief, argues that federal law prohibits inconsistent ballots, so this Court cannot honor Dr. Wilson's waiver, and that federal statutory deadlines preclude issuing new absentee ballots at this time. We conclude that neither federal nor state law precludes us from honoring Dr. Wilson's waiver.

¶40. As a general matter, only injunctive relief can remedy Dr. Wilson's injury. For instance, in *Wallace v. Election Commission of the Town of Edwards*, this Court found that the appropriate remedy when a qualified candidate was excluded from a ballot was a writ of mandamus ordering that his name be added to the ballot.[31] Here, the dispute centers on whether federal law precludes this Court from applying that remedy.

¶41. The Secretary of State argues that the United States Court of Appeals for the Fourth Circuit, in *Perry v. Judd*, held that federal law—specifically United States Code Title 52, Section 20302—requires states wishing to add new candidates to the ballot to issue all-new absentee ballots to overseas and military voters.[32] We do not agree. Section 20302 was not at issue in *Perry*. That statute was mentioned by the court when it explained that it considered the case on an expedited basis because the forty-five-day deadline to mail absentee ballots under Section 20302 soon would arrive.[33]

---

[31] *Wallace v. Election Comm'n of the Town of Edwards*, 118 So. 3d 568, 570 (Miss. 2013).

[32] *Perry v. Judd*, 471 Fed. Appx. 219 (4th Cir. 2012). *See* 52 U.S.C. § 20302 (2009)

[33] *Id.* at 220.

¶42. While the Fourth Circuit did state that, in that case, the State would be required to issue new absentee ballots, it did not analyze Section 20302, nor did it cite any opinion discussing or relying on Section 20302.[34] We cannot agree that the Fourth Circuit found that Section 20302 required new absentee ballots in the case before us today.

¶43. We are more persuaded by the United States District Court for the Middle District of Pennsylvania in *United States v. Pennsylvania*.[35] There, Ralph Nader and Peter Miguel Camejo had been candidates for President and Vice President of the United States when Pennsylvania prepared and mailed absentee ballots under Section 20302.[36] But their qualifications to run were subject to a subsequent legal challenge, and their names were ordered off the ballot.[37] The United States Department of Justice then sued Pennsylvania, seeking an order for the State to issue new ballots, without Nader's and Camejo's names, to all voters who received ballots under Section 20302.[38] The United States District Court for the Middle District of Pennsylvania denied the request, explaining that:

> The Government contends that the fact that UOCAVA[39] protected individuals have received ballots including the names of Nader and Camejo rather than the final ballot as certified on October 13, 2004, that excludes those names represents an UOCAVA violation. As the Commonwealth Defendants note,

---

[34] *Id.* at 227.

[35] *United States v. Pennsylvania*, 2004 WL 2384999 (M.D. Penn. Oct. 20, 2004).

[36] *Id.* at *1.

[37] *Id.*

[38] *Id.*

[39] "UOCAVA" stands for "Uniformed and Overseas Citizens Absentee Voting Act." *See* 52 U.S.C. § 20302.

18

this fact does not *ipso facto* support a finding that the Commonwealth is in violation of UOCAVA. As UOCAVA does not govern ballot content, the burden is on Plaintiff to establish that the alleged ballot defect undermines the right of UOCAVA voters to cast their ballots.[40]

¶44. We agree with the assessment by the district court that Section 20302 does not "govern ballot content." Nowhere does the statute require that subsequent ballots be issued when a ballot change occurs. Rather, the statute focuses on the right of voters timely to receive and submit ballots.[41]

¶45. In fact, the District Court focused its inquiry on the fact that "UOCAVA voters will, like all other absentee voters in Pennsylvania, vote the ballot that was legally correct *at the time they requested and were provided absentee ballots*."[42] It also noted that there was "no indication that UOCAVA voters irreparably would be harmed by casting the same ballot as every other absentee voter registered in the state who received a similar ballot."[43] We craft a similar remedy here by honoring Dr. Wilson's waiver and ordering that his name be included in the electronic Statewide Election Management System so that it may be made available through electronic voting machines on March 8.

**CONCLUSION**

¶46. We grant Dr. Wilson's petition for interlocutory appeal and order the Secretary of State to add Dr. Wilson's name to the electronic Statewide Election Management System,

---

[40] *Id.* at *4.

[41] 52 U.S.C. § 20302.

[42] *United States v. Pennsylvania*, 2004 WL 2384999, at *4 (emphasis added).

[43] *Id.*

19

so that it may be made available through electronic voting machines for the Democratic primary on March 8. We also order that any voting precincts using paper ballots for the March 8 election prepare ballots that include Dr. Wilson as a candidate. However, Dr. Wilson's name is not required to be added to any absentee ballots prepared or issued to voters. Finally, we accept Dr. Wilson's express waiver of any right to challenge absentee ballots going forward. No motion for rehearing will be allowed and the Clerk of Court is directed immediately to issue the mandate.

¶47. **REVERSED AND RENDERED**.

**RANDOLPH, P.J., KITCHENS, KING, COLEMAN AND BEAM, JJ., CONCUR. WALLER, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LAMAR AND MAXWELL, JJ. MAXWELL, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J.**

**WALLER, CHIEF JUSTICE, DISSENTING:**

¶48. "States have important interests in protecting the integrity of their political processes . . . [and] ensuring that their election processes are efficient . . . ." ***Clements v. Fashing***, 457 U.S. 957, 965, 102 S. Ct. 2836, 73 L. Ed. 2d 508 (1982). "As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the candidate's claim to be a serious candidate who has received a serious injury becomes less credible by his having slept on his rights." ***Kay v. Austin***, 621 F.2d 809, 813 (6th Cir. 1980). Voting for the Democratic Presidential Primary began in Mississippi on January 23, 2016. Dr. Willie Wilson waited until January 29, 2016, to raise a formal objection to the Secretary of State's refusal to place his name on the Democratic primary ballot. The majority's remedy – ordering Wilson's name to be placed

20

on the ballots to be cast on March 8, 2016, all while accepting absentee ballots which exclude Wilson – cannot be reconciled with the State's interest in ensuring the integrity of the election process. For this reason, I cannot join the majority.

¶49. Federal law mandates that absentee ballots for uniformed services voters and overseas voters ("UOCAVA voters") be transmitted forty-five days before a scheduled primary election. Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20302(a)(8) (2009). Mississippi's presidential preference primary election will be held on March 8, 2016. Thus, in order to comply with the federal mandate, Mississippi transmitted ballots to UOCAVA voters on January 23, 2016. To aid compliance with the federal mandate, Mississippi requires political parties to inform the Secretary of State of qualifying candidates for a presidential preference primary by January 19. *See* Miss. Code §§ 23-15-296, 23-15-1093 (Rev. 2015). This quick process provides little room for delay.

¶50. In today's case, the Mississippi Democratic Party informed the Secretary of State on January 19, 2016, that Wilson did not qualify for the presidential preference primary. The party informed Wilson of its decision on January 20, 2016. With the well-known January 23, 2016, deadline quickly approaching, Wilson opted to "negotiate" and "tried to work things out" with the Democratic Party. Instead of pursuing a formal hearing with the party or seeking immediate judicial intervention, Wilson continued to "haggle" with the party.

¶51. There is no dispute that Wilson had – at one time – the right to be on the Democratic primary ballot. *See **Meeks v. State***, 513 So. 2d 563, 564-65 (Miss. 1987) ("[W]hen one files the proper qualifying papers and pays the requisite filing fee to become a candidate for public

21

office, neither the state nor, in the case of a primary election, a political party may arbitrarily or capriciously deprive him or her of a place on the ballot."). *See also Kay*, 621 F. 2d at 811 ("[T]he right to be a candidate has been recognized as an important . . . interest.").

¶52. Wilson's right, however, must be considered along with the state's "compelling interest in maintaining the stability of its electoral system." *Id.* And "[a] state's interest in proceeding with an election increases as time passes, decisions are made, and money is spent." *Nader v. Blackwell*, 230 F. 3d 833, 835 (6th Cir. 2000).

¶53. In order to balance these two interests, political candidates must pursue claims diligently. *Kay*, 621 F. 2d at 813. *See also Fulani v. Hogsett*, 917 F. 2d 1028, 1031 (7th Cir. 1990) (To prevent prejudice to the state, political candidate's claim "must be expressed expeditiously."). Although candidates who take proper steps to run for political office have a right to be on the ballot, "there is no constitutional right to procrastinate." *Dobson v. Dunlap*, 576 F. Supp. 2d 181, 183 (D. Me. 2008).

¶54. "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983) (citing *Storer v. Brown*, 415 U.S. 724, 730, 94 S. Ct. 1274, 1279, 39 L. Ed. 2d 714 (1974)). To protect the state's interest in providing a fair democratic process, reasonable and nondiscriminatory restrictions are justifiable. *Id.*; *see also Williams v. Rhodes*, 393 U.S. 23, 43, 89 S. Ct. 5, 21 L. Ed. 2d 24 (1968) ("[T]he State may limit the right of political association by invoking an impelling policy justification for doing so."). Such restrictions

22

are even more crucial in a presidential primary election, when the outcome "has an impact beyond [a state's] own borders." *Id.* at 795, 103 S. Ct. 1564. Moreover, the state's interest in ensuring the "uniformity, fairness, accuracy, and integrity" of elections aids compliance with the strict forty-five-day deadline for UOCAVA voters. *Perry v. Judd*, 471 Fed. Appx. 219, 227 (4th Cir. 2012).

¶55. Considering the state's important interest in protecting the integrity of the election process, courts routinely have denied relief to candidates seeking ballot access. Often, courts deny relief based on the candidate's delay in challenging a ballot. In *Westerman v. Nelson*, 409 U.S. 1236, 1236-37, 93 S. Ct. 252, 34 L. Ed. 2d 207 (1972), Justice Douglas recognized that the petitioner's "complaint may have merit," but denied relief solely on timeliness: "in fairness to the parties I must deny the injunction, not because the cause lacks merit but because the orderly election process would likely be disrupted by so late an action. The time element has plagued many of these election cases; but one in my position cannot give relief in a responsible way when the application is [as] tardy as this one."

¶56. In *Dobson*, an independent candidate and voters supporting the candidate challenged Maine's statutory election deadlines and sought an injunction. *Dobson*, 576 F. Supp. 2d at 182. In denying the petitioners' "last minute" challenge, the district court considered the prejudicial effect of an untimely ballot change. *Id.* at 187-88. The court noted that the Secretary of State had taken steps to prepare and print ballots, and that any injunction at that point could "run the risk of restricting the voting rights of other voters, including overseas members of the military." *Id.* at 188. Ultimately, the court found that "prejudice to the

23

Secretary in stopping the printing presses is manifest" and denied relief. *Id.* In *Kay*, the Michigan Secretary of State refused to place a presidential primary candidate on the ballot, despite the candidate's assertion that he met the minimum statutory requirements to run as a nationally recognized candidate. *Kay*, 621 F. 2d at 810. In affirming the district court's denial of relief, the Sixth Circuit found that the candidate waited too long to challenge the Secretary of State's decision. *Id.* at 813.

¶57. In addition to charging candidates with the duty expeditiously to pursue ballot challenges, courts also require candidates to be aware of the statutory deadlines. *See Fishman v. Schaffer*, 429 U.S. 1325, 1327, 97 S. Ct. 14, 50 L. Ed. 2d 56 (1976) (denying relief, in part, because candidate was aware of statutory requirements and "could have brought suit earlier"); *Perry v. Judd*, 471 Fed. Appx. 219, 224-25 (4th Cir. 2012) (denying candidate's "eleventh hour" challenge to Virginia election laws "which have been on the books for years" and noting "Movant's delay was not the result of a lack of notice or clarity on the part of Virginia . . . . If Movant believed this provision violated the Constitution, he could and should have acted expeditiously); *Reform Party of Alabama v. Bennett*, 18 F. Supp. 2d 1342, 1351-52 (M.D. Ala. 1998) (denying constitutional claim due to candidates' failure to ascertain political party's status as major or minor party and holding candidates "are charged with knowledge of the law and are required to comply with its terms").

¶58. Today's case is similar to *Esiason v. Washington County Board of Elections*, 220 A.D. 2d 878, 878 (N.Y. App. Div. 1995), where, due to a misunderstanding between the Commissioner of Elections and the candidate, the candidate untimely filed certificates of

24

nomination. Despite the candidate having a "sympathetic case," the New York court denied relief: "relaxing the mandatory filing requirements would not only render the various deadlines set forth in the Election Law utterly meaningless, but would also interject confusion and inequality into a process where the Legislature plainly intended stability and uniformity to prevail." *Id.* at 879. The court further held "the mere fact that petitioners were not directly responsible for the failure to file relevant certificates in a timely fashion is of no moment." *Id.*

¶59.    Wilson's case, too, is sympathetic. The Mississippi Democratic Party now admits that Wilson met Mississippi's statutory requirements for inclusion on the presidential preference primary ballot. Wilson, however, is not without fault. Mississippi's deadline to comply with UOCAVA was January 23, 2016. Wilson waited until January 29, 2016, to lodge a formal complaint challenging the *Secretary of State's* decision not to include Wilson on the ballot. Seemingly lost in Wilson's pleadings is recognition that the Mississippi Democratic Party – not the Secretary of State – incorrectly decided to exclude Wilson from the ballot. Wilson did not name the Democratic Party as a party in today's case. And, while Wilson had the right to challenge the *party's* decision through a formal hearing, he chose a different route. *See Meeks*, 513 So. 2d 563.

¶60.    Wilson should have sought judicial intervention with the Secretary of State rather than engaging in the clearly futile attempt to "negotiate" with the Party prior to the Secretary of State's qualification deadlines. *Cf. **Miss. Dep't of Envtl. Quality v. Weems***, 653 So. 2d 266, (Miss. 1995) (quoting ***Ellington & Assocs., Inc., et al. v. Keefe***, 410 N.W.2d 857, 860 (Minn.

25

App. 1987)) ("[T]he doctrine of exhaustion of administrative remedies does not require that futile attempts at administrative relief be taken before seeking a judicial determination."). The deadlines imposed by federal law and the State's interest in ensuring the "uniformity, fairness, accuracy, and integrity" of elections leave no room for casual negotiations, and Wilson is charged with knowledge of these deadlines. By waiting to raise a formal challenge to his exclusion from the ballot, Wilson allowed the strictly imposed federal deadline to pass and Mississippi's election machinery to begin running. Wilson – and the majority – sidestep these facts by "waiving" any challenge to Wilson's name being on UOCAVA or other absentee ballots. Now, UOCAVA and absentee voters will receive different ballots than those cast on March 8, 2016. This remedy wholly fails to recognize the State's interest in regulating elections and the resulting prejudice from a late ballot change. The practical effect of the majority's opinion is to invalidate Mississippi's candidacy deadlines, as the tardiness of a party's internal processes or the candidate's actions to seek redress now are of no moment.

¶61. For these reasons, I cannot join the majority.

**LAMAR AND MAXWELL, JJ., JOIN THIS OPINION.**

**MAXWELL, JUSTICE, DISSENTING:**

¶62. All justices agree the party wrongly excluded Wilson from the ballot, but the remedy for this error is the sticking point. While I do not doubt the majority's sincere belief that complying with this court's order will not place the Secretary of State in violation of UOCAVA and other federal election laws, that issue remains to be seen. And this court's

26

order in no way shields the Secretary—or the validity of the Mississippi's Democratic primary itself—from federal challenge. Also, adding a candidate midstream, causing absentee voters to choose from different pools of candidates than those in ballots cast on March 8, 2016, has potential to disenfranchise voters and begs the question of just how late a candidate can be added. So I do not join the majority. I instead agree with the gist of Chief Justice Waller's point that Dr. Wilson's delay while trying to "negotiate"—instead of seeking a formal hearing with the party, then immediate judicial intervention—keeps him from receiving the remedy he seeks.

¶63. As Chief Justice Waller correctly notes in his dissent, the entity we all agree violated Wilson's due-process rights is not even named as party to this lawsuit. For this reason, the majority's heavy reliance on *Meeks v. Tallahatchie County*, 513 So. 2d 563 (1987), seems misplaced. In *Meeks*, unlike here, the would-be candidate sued the Mississippi Democratic Executive Committee. *Id.* at 564. So this court's instructions were directed to the state executive committees on what they must do to provide potential candidates due process. *Id.* at 565. This court ultimately concluded, if there were any procedural irregularities, they were harmless because the candidate was in fact disqualified. *Id.* Thus, *Meeks* did not consider what would be an appropriate remedy for an otherwise qualified candidate who did not learn about his disqualification until after the deadline to inform the Secretary of State. And it certainly did not consider the State's competing interest in orderly elections as a reason to deny a candidate's request to be placed on this ballot.

¶64. Nor do I see how *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963), a habeas corpus case involving a criminal defendant's right to counsel, is relevant. To suggest that the Secretary of State's enforcement of a known and necessary ballot deadline is akin to the atrocity of wrongful incarceration is, to put it mildly, quite a stretch. This is not to downplay Dr. Wilson's due-process rights. But as the Chief Justice pointed out in his dissent, Dr. Wilson had been in a position to protect his rights prior to January 23 but chose not to do so.

¶65. I further disagree with the majority's ordering "any voting precincts using paper ballots for the March 8 election prepare ballots that include Dr. Wilson as a candidate." I point out that Dr. Wilson did not ask for this remedy. Instead, his only request was that the Secretary of State be ordered to add his name to the electronic ballot. And even the majority acknowledges Dr. Wilson "has waived any right to challenge any ballot already printed or issued." So I do not see how this part of the order squares with Dr. Wilson's clear waiver. Instead, it only seems to create potential confusion for the county Democratic executive committees and the reported seventy-eight of eighty-two local election precincts that already have started printing ballots to be used on March 8.

¶66. For these reasons, I dissent.

**WALLER, C.J., JOINS THIS OPINION.**

28