THOMAS, Chief Judge,
dissenting:
Arizona has criminalized one of the most popular and effective methods by which minority voters cast their ballots. Because this law violates the Constitution and the Voting Rights Act, I must respectfully dissent.
I
Like most states, Arizona allows voters to cast a ballot on election day at a polling place, or to cast an early absentee vote, either in person or by mail. A.R.S. § 16-541. Early voting has become increasingly popular in Arizona, as evidenced by the fact that 81% of ballots east in.the last Presidential election were cast by early voting, a 12% increase from the 2012 election. An important reason for the increase in early voting is that Arizona has substantially reduced the number of polling places, resulting in extraordinarily long lines, with voters waiting many hours to cast their ballots. In one urban area, there is one voting center for nearly 70,000 registered voters. In some precincts in Maricopa County, voters waited for four hours to cast their ballots in the Presidential Preference Primary election earlier this year. In other precincts, the wait was up- to six hours. Compounding the problem is that, in Maricopa County in particular, polling places change with each election, and the County is using a different polling place system for the general election than it did in the Presidential Preference election earlier this year.
As the use of early voting has skyrocketed in Arizona, voters have increasingly used friends, organizations, political parties, and campaign workers to transmit their ballots. Some efforts are typical of “get-out-the-vote” campaigns by partisan groups; others are targeted to provide a service to those who cannot get to the polls. Because of geographic and other impediments to voting, voting by ballot collection has become a critical means for minority voters to cast their ballots. A substantial number of rural minority voters live in areas without easy access to mail service. In urban areas, many minority voters are socioeconomically disadvantaged, meaning that they may lack reliable mail service and have to rely on public transportation to get to polling places. ■.
• Nonetheless, Arizona enacted the law at issue, House Bill 2023, codified at A.R.S. § 16-1005 (H)-(I), which imposes felony criminal sanctions for non-household members or caregivers who collect early ballots from others. Plaintiffs filed this lawsuit challenging the law under the Voting Rights Act of 1965 and the First and Fourteenth Amendments to the United States Constitution. The district court denied the *396 plaintiffs’ motion for a preliminary injunction, and this interlocutory appeal followed. .
We review the denial of a preliminary injunction for abuse of discretion. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011). A district court abuses its discretion if its analysis is premised on an inaccurate view of the law. Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1123 (9th Cir. 2014). In such instances, we review de novo the legal premises underlying the preliminary injunction. Id.[1]
II
The district court erred in its analysis of the plaintiffs’ Fourteenth Amendment claims. First, it erroneously employed a rational basis review standard, when the appropriate standard was a “balancing and means-end fit analysis.” Pub. Integrity All. v. City of Tucson, 836 F.3d 1019, 1025 (9th Cir. 2016) (en banc). As Public Integrity Alliance recognized, the Supreme Court established the appropriate standard of review for laws regulating the right to vote in Burdick v. Takushi, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). As we explained in Public Integrity Alliance:
Under Burdick’s balancing and means-end fit framework, strict scrutiny is appropriate when First or Fourteenth Amendment rights “are subjected to ‘severe’ restrictions,”. Id. (quoting Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)). “But when a state election law provision imposes only ‘reasonable, nondiscriminatory restrictions’ upon the First and Fourteenth Amendment rights of voters, ‘the State’s important regulatory interests are generally sufficient to justify’ the restrictions.” Id. (quoting Anderson, 460 U.S. at 788, 103 S.Ct. 1564).
Pub. Integrity All., 836 F.3d at 1024.
However, rather than reviewing H.B. 2023 under a balancing and means-end fit analysis, the district court conducted a rational basis review, committing legal error.[2]
*397 The second, and more important legal error, was that the district court misapplied the analysis required by Burdick and Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). Under AndersonABurdiek, the court must weigh the nature and magnitude of the burden imposed by the law against the state’s interest and justification for it. Nader v. Brewer, 531 F.3d 1028, 1034 (9th Cir. 2008).
The burden of the law on Arizona minority voters is substantial and occurs in both urban and rural areas of the state. The uncontradicted evidence presented to the district court showed that, a substantial number of minority voters used ballot collection as their means of voting. As Mari-copa Board of Supervisors Steve Gallardo testified: “ballot collectors are used in large part by Latino and Native American groups and [ballot collecting] has come to be critical in enabling voters in those communities to exercise their fundamental right to vote.”
The record demonstrated that, in many rural areas with a high proportion of minority voters, home mail delivery was not available, and it was extremely difficult to travel to a post office. No one contested the fact that the rural communities of Somerton and San Luis, which are comprised of 95.9% and 98.7% Hispanic voters, respectively, were without home mail delivery and reliable transportation. As the representative for that district testified, “[b]ecause many of these voters are elderly and have mobility challenges, it is a common practice in this area to have one neighbor pick up and drop off mail for others on them street as a neighborly service.” The representative noted that there is only one post office, which is located across-a. highway crowded with ears waiting to cross the border, and is virtually inaccessible by foot.
Another example of the impact of the law on minority voters is the Tohono O’od-ham Indian Nation. The Tohono O’odham reservation constitutes over 2.8 million acres in the .Sonoran desert. It is an area larger than Rhode Island and Delaware, and approximates the size of Connecticut. It has about 14,000 registered voters. It does not have home mail delivery, It has one post office, which is over 40 miles away from many residents. The evidence in this case shows that restrictions on ballot collection affect the Tohono O’odham tribe significantly. No one contested the fact that the members of the Tohono O’od-ham Indian Nation have limited access to a postal service and no home mail delivery.
Similarly, no one disputed that members of the Cocopah Indian Tribe do not have home mail delivery or easy access to a post office. The Cocopah Reservation is located along the lower Colorado River, south of Yuma, Arizona. The Cocopah Reservation comprises approximately 6,500 acres, with approximately 1,000 tribal members who live and work on or near the Reservation.
As to urban areas, record evidence demonstrated that the burden of the law affected minority voters the most because of socioeconomic factors. Minority voters in urban areas were more likely to be eco- *398 noraically disadvantaged. The record showed that many minority urban voters lived in places with insecure mail delivery; that many minority urban voters were dependent upon public transportation, which made election day in-person voting difficult; that many minority voters worked several jobs, making it difficult to take time off work to vote in person; and that many infirm minority voters did not have access to caregivers or family who could transmit ballots.
Martin Quezada, State Senator for Arizona’s Twenty-Ninth Senate District testified that:
I represent approximately 213,000 constituents, nearly 80% of which are ethnic minorities. In particular, Hispanic citizens comprise 67% of the population of my district, the highest percentage of any district in the state of Arizona. My district is a working-class community, and many of my constituents depend oh public transportation. [... ] Many of my constituents were severely burdened by the long lines and lack of polling locations in the 2016 presidential preference election. My entire district only had one vote center, in Maryvale, to service the nearly 70,000 registered voters ....
The President of a nonprofit organization comprised of Latino citizens and community leaders testified that many minorities required assistance in making sure that they were following the proper voting procedure, and in low income areas they were concerned about the security of their mailboxes.
Further complicating voting in Arizona’s urban areas is that there are not only few places to vote, but that the polling locations change frequently. Indeed, because the City of Phoenix elections are run independently by the City, a voter might have to go to two different polling places to cast ballots on election day. According to the Executive Director of a nonprofit organization working primarily in low-income African-American and Latino neighborhoods, this confusion significantly burdened those communities because many minorities had difficulty navigating the voting process, especially those Spanish-speaking voters who were not also fluent in English. The record also showed that election administrators were prone to make errors with Spanish-language materials. Those voters encounter significant hurdles at polling places. Thus, the opportunity for early voting is especially important for those citizens.
The district court and the State dismiss the burdens imposed on minority voters seeking to vote early as attacks on a process that provides only'a'“more convenient” means of voting. However, when 80% of the electorate uses early absentee voting as the method by which they cast their ballots, the method has transcended convenience and has become instead a practical necessity. Thus, when severe burdens are placed on this form of voting, it has a significant impact on elections and the right to vote.
Against this burden, the state’s justification for the law was weak. The state identified its interest as preventing voter fraud. However, the sponsors of the legislation could not identify a single example of voter fraud caused by ballot collection. Not one. Nor is there a single example in the record of this case. The primary proponent of the legislation admitted there were no examples of such fraud, but that the legislation was, based on the speculative theory that fraud could occur. A study by the Arizona Republic found that, out of millions of ballots cast from 2005 to 2013, there were only 34 cases of fraud prosecution. All involved voting by felons or non-citizens. None involved any allegation of fraud in ballot collection. And none of the *399 cases resulted in a conviction. A study by the National Republican Lawyers Association, which was dedicated to finding voter fraud and investigated evidence of potential fraud between 2000 and 2011, uncovered no example of fraud resulting from the collection and delivery of early ballots in Arizona. A follow-up analysis through May of 2015 failed to uncover any examples of ballot collection fraud. The plaintiffs produced numerous affidavits that attested that no one associated with ballot collection had ever witnessed any voter fraud. Further, the record indicated that there are effective processes in place to handle any ballot that exhibits any signs that tampering has occurred. The Director of Elections for Maricopa County, the most populated county in Arizona, with a population of four times the next most populated county, testified at the legislative hearings that the County was well equipped to deal with voter fraud. Under state election procedure, voters can check the status of their ballot at any time. In short, the specter of voter fraud by ballot collection is much like the vaunted opening of A1 Capone’s vault: there is simply nothing there.
Thus, when one balances the serious burdens placed on minorities by the law against the extremely weak justification offered by the state, one can only conclude under the Andersortr-Burdick analysis that the plaintiffs have established a likelihood of success on the merits of their Fourteenth Amendment claim.[3] Based on the mostly úncontroverted record, the district court erred in misapplying Andersorv-Burdick.[4]
III
The district court also erred in denying the motion for a preliminary injunction based on the Voting Rights Act claims. The Voting Rights Act of 1965 “was designed by Congress to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century.” State of S.C. v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) abrogated by Shelby Cty., Ala. v. Holder, — U.S. -, 133 S.Ct. 2612, 186 L.Ed.2d 651 *400 (2013). The Act “implemented Congress’ firm intention to rid the country of racial discrimination in voting. It provided stringent new remedies against those practices which have most frequently denied citizens the right to vote on the basis of their race.” Allen v. State Bd. of Elections, 393 U.S. 544, 548, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).
The central purpose of the Act was “[t]o enforce the fifteenth amendment to the Constitution of the United States.” Chisom v. Roemer, 501 U.S. 380, 383, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (quoting Pub.L. 89-110, 79 Stat. 437, 42 U.S.C. § 1973 et seq.). The Fifteenth Amendment provides that “[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.” U.S. Const. amend. XV, § 1.
At issue in this case is § 2 of the Act, which is “a restatement of the Fifteenth Amendment.” Roemer, 501 U.S. at 392, 111 S.Ct. 2354, Section 2 provides, without limitation, that any voting qualification that denies citizens the right to vote in a discriminatory manner violates the Voting Rights Act. 42 U.S.C. § 1973; see also Allen, 393 U.S. at 566-67, 89 S.Ct. 817 (noting that Congress intentionally chose the expansive language “voting qualifications or prerequisite to voting, or standard, practice, or procedure” for § 2 so as to be “all-inclusive of any kind of practice” that might be used by states to deny citizens the right to vote (internal quotation marks omitted)). As amended in 1982, § 2 makes “clear that certain practices and procedures that result in the denial or abridgment of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge." Roemer, 501 U.S. at 383-84, 111 S.Ct. 2354.
To succeed on a § 2 claim, a plaintiff must show (1) that “the challenged standard, -practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of- the electorate to participate in the political process and to elect representatives of their choice” and (2) “that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.” League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 240 (4th Cir. 2014) (internal quotations omitted); see also Veasey v. Abbott, 830 F.3d 216, 244 (5th Cir. 2016).
The district court made a number of legal errors in its analysis of the § 2 claims, warranting reversal.
A
The district court erred in holding, as a matter of law, that § 2 requires proof of the disparate impact of a law by “quantitative or statistical evidence comparing the proportion of minority versus white voters who rely on others to collect their early ballots.” As the State concedes, there is no case law supporting this requirement; the district court relied only on cases it thought “strongly suggested” it.
Although quantitative or statistical measures of comparing minority and white voting patterns certainly may provide important analytic evidence, the district court erred in concluding that they were the exclusive means of proof. Indeed, the district court’s conclusion is belied. by the words of the Voting Rights Act itself, which provides that a violation of § 2 is “based on the totality of the circumstances.” 52 U.S.C. § 10301(b) (emphasis *401 added). The statute requires evidence that members of the affected minority class “have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.” Id. (emphasis added). The statutory criterion is incompatible with the district court’s restriction of proof to quantitative denial of actual minority voting compared with white voting. The relevant question- is whether the challenged practice, viewed in the totality of the circumstances, places a disproportionate burden on the opportunities of minorities to vote. Veasey, 830 F.3d at 244-45; League of Women Voters, 769 F.3d at 240. Even when analyzing the second part of the § 2 test, which does require causality, statistical analyses are not the exclusive method of showing a violation.[5] Veasey, 830 F.3d at 244. Indeed, the Supreme Court has eschewed that approach in favor of consideration of various factors. Gingles, 478 U.S. at 44-45, 106 S.Ct. 2752. Rather than narrowly interpreting the Voting Rights Act, the Supreme Court has emphasized its “broad remedial purpose of ridfding] the country of racial discrimination in voting” and has explained that it provided “the broadest possible scope in combating racial discrimination.” Roemer, 501 U.S. at 403, 111 S.Ct. 2354. The district court’s mechanical formulation is also at odds with the “totality of the' circumstances” approach we underscored in Gonzalez v. Arizona, 677 F.3d 383, 406 (9th Cir. 2012), The district court’s restriction constitutes legal error.
Even if we leave aside the irreconcilable conflict between the district ■ court’s proposed rule and the requirements of the governing statute, the district’s approach is still fatally flawed.
First, quantitative measurement of the effect of a rule on the'voting behavior of different demographic populations must necessarily occur after the election. One cannot statistically test the real world effect of a rule in the abstract; it can only be measured by actual voting data. In other words,- imposition of the district court’s proposed rule would mean that-there could never be a successful pre-election challenge of the burdens placed on minority voting opportunity because no data will have been generated or collected. The analysis could only occur after the harm had been inflicted. That result cannot be squared with the broad remedial purposes of the Voting Rights Act. The Fifth Circuit, in rejecting an approach similar to the district court’s, acknowledged this problem, observing that requiring such proof would “present[ ] problems for pre-election challenges ... when no such data is yet available.” Veasey, 830 F.3d at 260.
Second, the relevant data is not available in Arizona. The State concedes that it does not collect the necessary data, and asserts that it should not bear that burden in the *402 absence of a law that requires it to do so. The State suggests that plaintiffs should use data from those organizations who collect ballots. Of course, that action would now be a felony. But leaving that aside, there would be no practical way for the plaintiffs to collect comparative data by that method because it is highly unlikely they could force competing organizational groups to collect and supply the data. And such a method would not likely yield true comparative results. At best, it would show that white voters, and minority voters both have used ballot collection as a means for casting their ballots. No one disputes that, .nor does anyone seriously dispute the fact that minority citizens are especially dependent on ballot collection has a means of voting. Further, even if past data were available, it still would not ■ answer the district court’s query because the data gathered would be pre-rule, and therefore not relevant as a means of assessing the rule’s impact.
Third, the district court acknowledged the difficulty of obtaining the data because “election and other public records often do not include racial or ethnic data,” and noted that “[t]here is no getting around this problem.” Nonetheless, the court held that the statute still required a threshold statistical showing, even though collecting such evidence was likely impossible. That was not the intent of the Voting Rights Act, and it is just such a circumstance that requires assessment of the “totality of the circumstances.”
Fourth, in its examination of the plaintiffs’ evidence, the district court erred in its comparative analysis. It faulted the plaintiffs for not showing comparative data from other rural white-centric areas. But that is not the examination required by "the Voting Rights Act. Section 2 examines whether “members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.” Veasey, 830 F.3d at 305; League of Women Voters of N.C., 769 F.3d at 240 (emphasis added). It does not test opportunity against “other members of the electorate” who are “similarly situated.” Thus, contrary to the district court’s analysis, the comparison is not with similarly situated white groups, but rather with the voting population as a whole. If the district court’s assumption were correct, then literacy and poll tax statutes would be constitutional because they placed the burdens on illiterate and poor whites and blacks equally. Instead, the Voting Rights Act focuses on the burdens disproportionately place on minorities in comparison with the general voting population. Native American voters living on reservations have different burdens as to transportation and mail access than urban white voters. A state may not evade the requirements of § 2 by arguing that it equally applies to a subset of white voters .constituting a minuscule percentage of the white vote, when the overall effect is the suppression minority voting.
And even if we were to take the district court’s analysis at face value, it fails in. consideration of the evidence in this case. The district court’s conclusion is at odds with the evidence showing the law disproportionately burdens minorities. I have previously described the situation faced by the Tohono O’odham Nation, situated on 2.8 million acres, with limited access to a post office and no home mail delivery. Everyone concedes that there is no white population analogue. There are no white reservations in Arizona. There is no comparably sized rural area that encompasses a white-majority population. The record evidence was plain and uncon-troverted: H.B. 2023 places a disproportionate burden on the voting opportunities *403 of members of the Tohono O’odham tribe in comparison with the population of white voters.
The evidence provided by the plaintiffs showed a similar pattern in urban areas. Minority voters encountered significant burdens in exercising their right to vote. The reduced number of polling places meant that voters had to wait hours in line to cast ballots. Low income voters had difficulty getting to the polls because of their dependence on public transportation. Voters who were not fluent in English had difficulty determining where to vote. Statistical evidence is not needed to see that without ballot collecting, these voters will have less opportunity than other members of the electorate to participate in the political process.
In sum, the district court committed legal error by requiring the plaintiffs to show proof of the disparate impact of the law by “quantitative or statistical evidence comparing the proportion of minority versus white voters who rely on others to collect their early ballots.” That formulation is at .odds with the governing statute, which requires analysis by “totality of the circumstances” of whether members of the affected minority class “have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.” 52 U.S.C. § 10301(b).
B
The district court also erred as a matter of law in its assessment of the plaintiffs’ burden of proof. “[T]he burden of proof at the preliminary injunction phase tracks the burden of proof at trial .... ” Thalheimer v. City of San Diego, 645 F.3d 1109, 1116 (9th Cir. 2011). In a voting rights case, the plaintiff bears the burden of proof at trial and must show a violation by a preponderance of the evidence. Bartlett v. Strickland, 556 U.S. 1, 19-20, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009). Thus, the parties seeking a preliminary injunction in this case must show they are likely to prevail on the merits; if the plaintiffs satisfy that burden, then the opposing parties bear the burden of réjoínder. Thalheimer, 645 F.3d at 1116.
Here, the district court rejected plaintiffs’ tendered evidence because it was not “compelling.” At the preliminary injunction stage, the plaintiff is not required to present “compelling” evidence, but only to establish a ,likelihood of success by a preponderance of the evidence. The district coúrt also rejected the tendered evidence as “anecdotal,” but the Supreme Court has considered and credited just such evidence. At the preliminary injunction stage, plaintiffs were obligated to show a likelihood of success in showing that “members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.”
Much of the evidence tendered by the plaintiffs as to this burden was not controverted. As I have noted, no one contested the fact that the rural communities . of Somerton and San Luis, which, are. , comprised of 95.9% and 98.7% Hispanic voters, respectively, were without home mail delivery and reliable transportation. No one contested the fact that the members of the Tohono O’odham Indian Nation- do not have home mail delivery. No one disputed that members of the Cocopah Indian Nation do not have home mail delivery. The plaintiffs submitted voluminous affidavits showing the burden that the restriction on ballot collection would impose on minorities. The State did not contest the affidavits, but simply dismissed the evidence as “anecdotal.” Thus, much of the evidence tendered by the plaintiffs as to the dispro *404 portionate burden on minority voters was either completely undisputed or uncontested/
However, once the plaintiffs had established the burden on minority voters, the district court did not place the burden of rejoinder on the State. Rather, it categorically rejected evidence based on personal knowledge as “anecdotal,” and held that the plaintiffs were required to show that rural white voters were not similarly burdened. In other words, once the plaintiffs had 'established the burden on minority voters, the district court imposed a higher standard of proof, rather than shifting the burden of rejoinder to the State, The record provides no information as to rural white voters. The district court viewed that as fatal to the plaintiffs’ claims. In fact, it meant that the plaintiffs had satisfied their threshold requirements, and the State had failed to rejoin. The district court erred in holding the plaintiffs to a higher evidentia-ry burden.
C
The district court did not reach the second prong of the § 2 analysis, namely, whether the burden was in part caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class; Nevertheless, the plaintiffs established a likelihood of success on the second prong.
As to the second part of the analysis, the Supreme Court has identified several factors to be taken into consideration, consistent with the legislative history of the Voting Rights Act, namely:
(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the . members of the minority group to register, to vote, or otherwise to participate in the democratic process;
(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;
(3) • the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
(6) whether political campaigns have been characterized by overt or subtle 'racial appeals; and
(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.
Gingles, 478 U.S. at 37, 106 S.Ct. 2752. In addition, the Court added that in some cases, there was probative value in inquiring “whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group” and “whether the policy underlying the state or political subdivision’s use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.” Id. (citing S. Rep., at 28-29, U.S.Code Cong. & Admin, News 1982, pp. 206-207).
As to the first factor, the extent of any history of official discrimination in the *405 state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process, Arizona has had a long history of imposing burdens on minority voters. In 1912, shortly after gaining statehood, Arizona imposed a literacy test for voting. In Cochise and Pima Counties, the denial of the right to vote meant that nearly half the precincts lacked enough voters to justify holding primary elections in 1912. From 1912 to the early 1960s, election registrars applied the literacy test to reduce the ability of African Americans, Native Americans, and Hispanics to register to vote. In an action filed against Arizona to enforce the Voting Rights Act, the United States Justice Department estimated that 73,000 people could not vote because of the existence of the literacy test.
The passage of the Voting Rights Act in 1965 caused the suspension of the literacy test in Arizona, but the statute remained in effect until it was repealed in 1972, after Congress banned its use in 1970 through an amendment to the Voting Rights Act. Arizona subsequently unsuccessfully challenged the Congressional ban on literacy tests. Oregon v. Mitchell, 400 U.S. 112, 118, 91 S.Ct, 260, 27 L.Ed.2d 272 (1970). In Mitchell, the Court noted that, in Arizona, only two counties out of eight with Hispanic populations in excess of 15% showed voter registration equal to the state-wide average. Id. at 132, 91 S.Ct. 260. In the 1960s, there were a number of initiatives to discourage minority voting in Arizona, such as “Operation Eagle Eye.” Under Operation Eagle Eye, minority voters were challenged at the pools on a variety of pretexts, with the goal of preventing minority voting or slowing down the process to create long lines at the polls and discourage voting.
Native Americans in Arizona especially suffered from voting restrictions. Although Native Americans were U.S. citizens, the Arizona Supreme Court held in 1928 that they: could not vote because they were under federal guardianship. Porter v. Hall, 34 Ariz. 308, 271 P. 411, 419 (1928). Even after that ban was overruled in 1948 in Harrison v. Laveen, 67 Ariz. 337, 196 P.2d 456 (1948), Native Americans faced significant obstacles to voting. See generally, Patty Ferguson-Bohnee, The History of Indian Voting Rights in Arizona: Overcoming Decades of Voter Suppression, 47 Ariz. St. L.J. 1099, 1112 (2015).
Because of its long history of imposing burdens on minority voting, Arizona became one of nine states subject to the pre-clearance' requirements of the Voting Rights Act after it was amended in 1975 to protect language minorities. 40 Fed. Reg. 43746. Under the pre-clearance provision, Arizona wa.s required to obtain the approval of the United States Department of Justice before implementing any law affecting the voting rights and representations of minorities. Since 1982, the Department of Justice has vetoed four statewide redistricting plans proposed by Arizona that appeared to discriminate against minorities. When Arizona was subject to the pre-clearance requirements of § 5, a bill precluding or criminalizing ballot collection passed the Arizona legislature, but was ultimately repealed due to concerns about Justice Department approval. In 2013, the Arizona legislature passed a measure banning partisan ballot collection, the violation of which was a misdemeanor. It was repealed after its repeal was placed on the ballot by referendum. The plaintiffs established a likelihood of success as to the first factor.
As to the second factor, the extent to which voting in the elections of the state or political subdivision is racially polarized, *406 Arizona has had a history of racially polarized voting; The plaintiffs provided expert testimony detailing the history of polarized voting. Statistical analysis showed the sharp polarization between white and nonwhite voters.
For the reasons described in the discussion of factor one, the plaintiffs demonstrated a likelihood of success as to factor three, namely, the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.
Because the voting access issues affect the right to vote for a candidate, the fourth factor concerning the candidate slating process is not relevant.
The fifth factor, the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process, falls decisively in favor of the plaintiffs. The plaintiffs tendered significant evidence showing that Arizona minorities suffered in education and employment opportunities, with disparate poverty rates, depressed wages, higher levels of unemployment, lower educational attainment, less access to transportation, residential transiency, and poorer health.
The plaintiffs also provided substantial evidence as to the sixth factor, namely, whether political campaigns have been characterized by overt or subtle racial appeals.
Finally, the plaintiffs provided evidence supporting the seventh Gingles factor, namely, the extent to which' members of the minority group have been elected to public office in the jurisdiction. As of January 2016, Hispanics constituted over 30% of the population, but held only 19% of the seats in'the Arizona legislature. African-Americans made up 4.7% of the population, but held 1% of the legislative seats. Native Americans fared slightly better, constituting 5.8% of the population and holding 4.4% of the legislative seats.
But the Gingles factors are not the end of the story. We are obligated to look to the “totality of the circumstances.” 52 U.S.C. § 10301(b). In this election, in-person voting opportunities are significantly hindered by lack of polling places and significant changes in polling places, all of which have caused extraordinarily long lines for voting in person, up to six hours in some locations. This hindrance to in-person voting falls most heavily on minorities. So, the cited “opportunities” for alternate voting are illusory. H.B. 2023 has now imposed additional significant burdens on minorities as to their ability to cast their ballots early through the popular means of ballot collection. The totality of the circumstances of this election, coupled with the historic discrimination in Arizona’s electoral politics are sufficient to satisfy the second § 2 requirement. In sum, the plaintiffs established a likelihood of success in proving the Gingles factors at stage two of the § 2 analysis.
D
The plaintiffs established a likelihood of success on the § 2 Voting Rights Act claim. They established that the criminalization of ballot collection meant that minority voters had less opportunity than other members of the electorate to elect representatives of their choice, and that the burden in part was caused by or linked to social and historical conditions that have *407 or currently produce discrimination against minorities.
IV
The district court should have granted the motion for a preliminary injunction. The district court made a number of legal errors. The plaintiffs established that the anti-ballot-collection law significantly burdens the voting rights of minorities, particularly Hispanic and Native American voters. The State’s justification of preventing voter fraud was "not, and is not, supportable. One of the most popular and effective methods of minority voting is now a crime. H.B. 2028 violates the Constitution and the Voting Rights Act.
There are many burdens and challenges faced in Arizona by Native Americans, Hispanics, African-Americans, the poor, and the infirm who do not have caregivers or family. With H.B. 2023, Arizona has added another: disenfranchisement.
I respectfully dissent.
O’SCANNLAIN, Circuit Judge, with whom CLIFTON, BYBEE, and CALLAHAN, Circuit Judges, join, and with whom N.R. SMITH, Circuit Judge, joins as to Parts I, II, and III, dissenting from the order enjoining the State of Arizona:
The court misinterprets (and ultimately sidesteps) Purcell v. Gonzalez, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006), to interfere with a duly established election procedure while voting is currently taking place, contrary to the Supreme Court’s command not to do so. I thus respectfully dissent from this order enjoining the state of Arizona from continuing to follow its own laws during an ongoing election. And let there be no mistake: despite the majority’s pretenses to the contrary, the order granting the injunction is a ruling on the merits, and one based on an unnecessarily hasty review and an unsubstantiated statutory and constitutional analysis.[1]
I
Some background: On September 23, 2016, the district court denied plaintiffs’ motion for a preliminary injunction blocking Arizona from implementing certain provisions in Arizona House Bill 2023 (H.B. 2023). These provisions limit the collection of voters’ early ballot's to family members, household members, certain government officials, and caregivers. Plaintiffs appealed. A Ninth Circuit motions panel unanimously denied plaintiffs’ emergency motion for an injunction pending appeal on October 11. That same panel sua sponte amended its October 11 ruling to expedite the appeal on October 14. A merits panel received briefing, heard oral argument; and issued an opinion on October 28, affirming the district court and denying the request for a preliminary injunction by a two-to-one. majority. The case was called en banc the same day the opinion was issued. Eschewing our normal en banc schedule, memo exchange was compressed into .five days, as opposed to our customary thirty-five. Now, just two days after the en banc call succeeded, and just four days before Election Day, the majority overturns the district court, a *408 motions panel, and a separate merits panel to reach its desired result.
II
The Supreme Court counseled against just this type of last-minute interference in Purcell. That case also involved our court’s issuing a last-minute injunction against the enforcement of a contested Arizona election law. 549 U.S. at 2-4, 127 S.Ct. 5. The Supreme Court, on October 20, 2006, vacated that injunction, which had been implemented by a Ninth Circuit motions panel on October 5 — more than four weeks before the election. Id. at 2-3, 127 S.Ct. 5. In doing so, the Court stressed the “imminence of the election” and the need to give the case adequate time to resolve factual disputes. Id. at 5-6. Despite Purcell’s direct impact on this case, the majority con-fínes that decision much too narrowly, and in its strained attempt to distinguish Purcell, disregards how this eleventh-hour injunction will impact the, current election and many elections to come.
At first, it seemed that we might respect Supreme Court precedent this time around, when first the motions panel, and later the three-judge merits panel, wisely determined that no injunction should issue at this stage. Yet, after a third bite at the apple, here we are again — voiding Arizona election law, this time while voting is already underway[2] and only four days before Election Day. In doing so we’ depart from our own precedent, see, e.g., Lair v. Bullock, 697 F.3d 1200, 1214 (9th Cir. 2012) (staying a district court’s injunction “given the imminent nature of the election”), and myriad decisions of our sister circuits, see, e.g., Crookston v. Johnson, 841 F.3d 396, 398 (6th Cir.2016) (“Call it what you will — laches, the Purcell principle, or common sense — the idea is that courts will not disrupt imminent elections absent a powerful reason .... ”); Veasey v. Perry, 769 F.3d 890, 895 (5th Cir. 2014) (staying an injunction “in light of the importance of maintaining the status quo on the eve of an election”); Colon-Marrero v. Conty-Perez, 703 F.3d 134, 139 n.9 (1st Cir. 2012) (noting that “even where plaintiff has demonstrated a likelihood of success, issuing an injunction on the eve of an election is an extraordinary remedy with risks of its own”). We also disregard not only Purcell, but other Supreme Court authority disfavoring last-minute changes to election rules. See, e.g., North Carolina v. League of Women Voters of N.C., — U.S. -, 135 S.Ct. 6, 190 L.Ed.2d 243 (2014) (granting stay to prevent interference with election procedures roughly one month before election).[3] In all these cases, “the common thread [was] clearly "that the decision of the Court of Appeals would change the rules of the election too soon before the election date.” Veasey, 769 F.3d at 895.
The majority recognizes the need to address Purcell and’ its progeny. But the *409 majority’s strained attempt'to distinguish those cases -is unconvincing — its reasoning either misrepresents Purcell or is irrelevant to the issues at hand. And it misses the main point of Purcell: the closer to an election we get, the more unwarranted is court intrusion into the status quo of election law.
A
First, the majority makes the incomprehensible argument that its injunction “does not affect the state’s election processes or machinery.” Order at 7. The majority cites no law, fact, or source of any kind in support of this argument, and it is dubious on its face. Of course, H.B. 2023 directly regulates the state’s election processes or machinery: it governs the collection of ballots, which obviously is integral to how an election is conducted. But under the majority’s Orwellian logic, regulations affecting get-out-the-vote' operations are somehow not regulations of the “electoral process.” (What are they, then, one might ask? The majority doés not tell.) Apparently, the majority believes that only measures that affect the validity of a vote itself (or a voter herself) affect such process. Other courts, in ruling on similar regulations, have rejécted the majority’s view, and widely held that regulations of many aspects of an electibn beyond the validity of a vote affect the election process. See, e.g., Lair, 697 F.3d at 1214 (staying injunction of certain campaign finance laws); see also Harris v. Graddick, 593 F.Supp. 128, 135 (M.D. Ala. 1984) (observing that even the racial[1] composition of polling officials could affect the election process).
Tellingly, the majority barely addresses whether enjoining H.B. 2023 will create confusion and disruption in the final days of the election — a key factor in the Purcell decision. 549 U.S. at 4-5, 127 S.Ct. 5 (“Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.”). And, based on this record, how could it? Factual development in the record is sparse. The majority' says its injunction will be less disruptive than the.Purcell injunction, but offers not a shred of empirical proof for this proposition. Order at 7-10. At this point, it appears that no one knows just how much confusion this court risks by issuing this injunction, after weeks of procedures suggested it would not.[4] What we do know is that the State has approximately four days to figure out and to implement whatever response is necessary to accommodate our latest view of the case. If requiring such action is inappropriate four weeks prior to Election Day, see Purcell, 549 U.S. at 3-4, 127 S.Ct. 5, it surely is in the waning days of voting. The Supreme Court could not have been clearer: “[a]s an election draws closer, that risk [of disruption] will increase.” Id. at 5.
B
The majority’s second argument — that this case is different because it involves a law that imposes criminal penalties — manages to be both irrelevant and incorrect. It is irrelevant because Purcell never says, or *410 even indicates, that whether a law imposes criminal penalties affects whether the status quo should be upset right before an election. It is incorrect because our own circuit applied Purcell in a case involving a law that affected the electoral process and imposed criminal penalties. See Lair, 697 F.3d at 1214 (staying an injunction that applied to Montana campaign finance law enforced by criminal penalties).
C
Third, the majority misreads Purcell by inventing a supposed Purcell Court concern that the federal judiciary was “disrupting] long standing state procedures” and then equating it with the majority’s desire to preserve the pre-H.B. 2023 status quo. Order at 9. Nowhere in Purcell does the Court mention “long standing state procedures.” Proposition 200, the voter identification law at issue in Purcell, had been approved by Arizona voters in 2004 and was not precleared until May of 2005. 549 U.S. at 2, 127 S.Ct. 5. The 2006 election was the first federal election at which it would go into effect. The voter identification law was relatively new, but, “[gjiven the imminence of the election,” the Court overturned our injunction which would have returned Arizona to a pre-Proposition 200 world, the majority’s so-called “status quo.” Id. at 5. Obviously, Purcell was actually concerned with changes to the status quo that had occurred within weeks of an election.
And that status quo can be a law or an injunction that has been in place for just a few months. See Frank, 135 S.Ct. at 7. In Frank, the Supreme Court vacated the Seventh Circuit’s September 26, 2014 stay of a preliminary injunction enjoining application of Wisconsin’s voter ID law, which had been put in place by the district court in April 2014. By the time the Seventh Circuit issued its decision, the injunction had become the new “status quo,” even the dissent had to concede the “colorable basis for the Court’s decision.” Id. at 7 (Alíto, J., dissenting). The dissent noted that given the “proximity of the election,” it was “particularly troubling that absentee ballots [relying on the injunction] ha[d] been sent out without any notation that proof of photo identification must be submitted.” Id.
D
Fourth, the argument that “unlike the circumstances in Purcell and other cases, plaintiffs did not delay in bringing this action” continues the majority’s pattern of inventing facts. Order at 9. Nowhere in Purcell does the Supreme Court discuss the timing of the plaintiffs’ filing. Nowhere does it say that the plaintiffs affected their chances of success by delaying their filing. Nowhere does it use this factor in its analysis. Indeed, as recounted above, the Supreme Court is far more focused on the date of court orders that upset the status quo in relation to the date of the election. See, e.g., League of Women Voters, 135 S.Ct. at 6. (staying an injunction ordered by the Fourth Circuit a month before the election despite the fact that plaintiffs challenged the statute at issue a year prior to: the election).
E
Finally, perhaps betraying its real motivation, the majority bafflingly suggests that our last-minute intervention is required now that the Supreme Court struck down the federal preclearance mechanism in Shelby County v. Holder, — U.S. -, 133 S.Ct. 2612, 2631, 186 L.Ed.2d 651 (2Ó13). But, whatever the majority might think of that opinion, Shelby County has absolutely no relevance to the Court’s decision in Purcell.
*411 The majority is correct about one basic point: in discussing the procedural history in Purcell, the Supreme Court mentioned that the regulation at issue had been pre-cleared. 549 U.S. at 2, 127 S.Ct. 5. But the Court did not suggest that preclearance was in any way relevant to its decision. Despite the majority’s oblique citation to Purcell, one will not find any support in that decision for its statement that pre-clearance meant the law in Purcell was presumptively valid — or that any such presumption mattered at all to the question before the Court. Quite to the contrary, the Supreme Court explicitly cautioned that it was not addressing the merits of the claim in Purcell. Id. at 5, 127 S.Ct. 5 (“We underscore that we express no opinion here on the correct disposition, after full briefing and argument, of the appeals [from the district court]_”).
Even if the majority believes that courts should engage in a heightened review of voting laws after Shelby County — and I stress the Supreme Court has given us absolutely no reason to believe we should — that does not support the notion that such review matters at this stage of litigation. Purcell is plainly about the impact a court order will have on an upcoming (or in our case, ongoing) election, not the merits of the constitutional claim underlying that order. Id. Pre-clearance, Shelby County, and the merits of the challenge to H.B. 2023 are beside the point. Four days before an election is not an appropriate time for' a federal court to tell a State how it must reconfigure its election process.
Ill
Unfortunately, though I believe the merits should not have been reached until a more thorough review of the case could have been conducted — and ideally more evidence could have been collected, including quantitative data — the majority’s decision to consider and then to grant an injunction pending appeal forces the issue. In doing so, and given the current record, the majority, by adopting Chief Judge Thomas’s dissent, makes various errors in both its constitutional and federal statutory analysis that further undermine its argument that an injunction is necessary. Order at 6 (adopting the reasoning of Feldman v. Arizona Sec’y of State, 840 F.3d 1057, 1085-98 (9th Cir. 2016) (Thomas, C.J., dissenting)). This situation means we are forced to reach the merits as well. See Order at 6 (citing Lopez v. Heckler, 713 F.2d 1432, 1435 (9th Cir. 1983)).
Unlike the majority, we are persuaded by the analysis of the vacated three-judge panel' majority opinion and the district court opinion. Feldman, 840 F.3d at 1062-87; Feldman v. Arizona Sec’y of State, No. CV-16-01065-PHX-DLR, — F.Supp.3d —, 2016 WL 5341180 (D.C. Ariz. Sept. 23, 2016) [hereinafterFeldman (D.C.)]. A few key points, some contained in those opinions, are worth highlighting. One error in the majority’s reasoning stands out the most — its failure even to pretend to give any deference to the district court’s denial of exactly the same request. See Purcell, 549 U.S. at 5, 127 S.Ct. 5 (concluding that the failure of “the Court of Appeals to give deference to the discretion of the District Court .,. was error”).
A
The majority’s Fourteenth Amendment analysis falsely claims the district court improperly conducted a “rational basis” review. Feldman, 840 F.3d at 1085-87 (Thomas, C.J., dissenting). Yet, the district court never used the phrase “rational basis,” instead it .explicitly stated that Arizona “must show [ ] that it[s law] serves important regulatory interests,” after it *412 conducted the burden analysis.[5] Feldman (D.C.), — F.Supp.3d at -, 2016 WL 5341180, at *11.
The majority argues that H.B. 2023 imposes a “substantial burden” on voting, but this cannot be reconciled with the fact six Justicés in Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008), found that Indiana’s voting ID law imposed either a “a limited burden,” id. at 202, 128 S.Ct. 1610 (Stevens, J., .writing for three justices), or a “minimal” one, id. at 204, 128 S.Ct. 1610 (Scalia, J., writing for three justices). The majority does not even try to argue that H.B. 2023 imposes more of a burden on voters than the Indiana law, instead it just does not cite Crawford.
, The, majority argues that the “state’s justification for the law was weak.” Feld-man, 840 F.3d at 1089 (Thomas, C.J., dissenting). This cannot be reconciled with Crawford’s language that “[t]here is no question” that a state’s interest in preventing voter fraud is an important interest. 553 U.S. at 194-97, 128 S.Ct. 1610 (holding this .even, though there was no evidence in the record that the particular type of voting fraud the law was trying to prevent has .occurred). Arizona’s interest in-protecting public confidence in elections is also an established important interest. Id. at 197, 128 S.Ct. 1610. Once again the majority “solves” this problem by pretending that Craioford does not exist,
B
The majority’s Voting Rights Act of 1965 (VRA) Section 2 analysis is equally shoddy. 52 U.S.C. § 10301, It concedes that no statistical or quantitative evidence exists in the record. Feldman, 840 F.3d at 1093 (Thomas, C.J., dissenting). It concedes that “the Voting Rights-Act focuses on the burdens disproportionately place [sic] on minorities in comparison with the general voting population.” Id. at 1093 (emphasis added). It concedes that “[t]he relevant question is whether the challenged practice ... places a disproportionate burden on the opportunities of minorities to .vote.” Id. at 1092. It concedes the burden lies with the plaintiffs and that “the parties seeking a preliminary injunction in this case must show they are likely to prevail on the merits.” Id. at 1094.
Yet, it then argues that the district'court erred by asking plaintiffs to show the burden on minority voters was greater than that of white voters. Id. at 1093-94. But the plaintiffs had the burden of showing disparate treatment. Instead of acknowledging that the current record’s lack of facts showing a disparate impact is fatal to this claim, the majority invents a burden-shifting requirement. Id. at 1085-89. It argues that “once the plaintiffs had established the burden on minority voters” the district court erred by not “shifting the burden of rejoinder to -the State.” Id. at 1094, This burden-shifting requirement— which would require the state to prove a negative (no disparity if minorities are burdened) — has no support in the law.
IV
Finally, the unusual procedural history leading up to this decision and the contrived time pressure we placed ourselves under in rendering this decision underscores exactly why courts refrain from in *413 tervening in elections at the last minute unless they absolutely have to.[6]
After presumably fuller consideration than our own, a district court judge, a three-judge motions panel, and a two-judge majority of a separate merits panel all rejected Feldman’s attempt to have enforcement of H.B, 2023 enjoined for the current election. Yet, with only three days of review (and no oral argument), a majority of our hastily constructed en banc panel has reversed course, requiring Arizona to change its voting procedures the weekend before Election Day. The record presented in this appeal exceeds 3000 pages; the parties’ briefs (which now total five, after additional en banc briefing) present complex and well-reasoned arguments; and the alleged constitutional violations are serious. But our en banc panel has found it appropriate (indeed imperative) to resolve the matter in less time than we might usually take to decide a motion to reschedule oral argument.
Despite the majority’s pretenses to having “given careful and thorough consideration” to the issues presented in this case, Order at 10, one wonders how much the obvious dangers inherent in our rushed and ad hoc process have infected the decision in this case. Cf. Purcell, 127 S.Ct. at 6 (Stevens, J., concurring) (“Given the importance of the constitutional issues, the Court wisely takes action that will enhance the likelihood that they will be resolved correctly on the basis of historical facts rather than speculation.”).
The circumstances of this case do not inspire confidence in the majority’s order. First, the majority does not appear even to have resolved what, to label the relief it has determined must be handed down in this case.[7] More concerning, and as discussed above, the order fails seriously to grapple with controlling Supreme Court precedent pertaining both to appropriateness of our action at this stage of litigation and to the underlying merits of the issues in this case. The order also wholly fails to explain why it is now necessary to overrule a unanimous order from October .11 — which was approved by one of the judges who now joins the majority — denying an identical emergency motion in this same case. We are left only to wonder why that decision, acceptable four weeks ago, is now the cause for immediate correction.
Worse still is the precedent this hastily crafted decision will create. The majority purports to delay ruling on the merits of the challenge to H.B. 2023 — presumably so that this case can be carefully considered. Order at 11. But it “essentially” adopts the reasoning of a twenty-nine page dissent from the priginal three-judge panel opinion, Order at 6, which concludes that it is clear “this law violates the Constitution and the Voting Rights Act.” Feldman, 840 F.3d at 1086 (Thomas, C.J., dissenting). If our court agrees with the essence of that dissent, what is left to decide after oral argument? The majority’s framing of this issue as just a “stay,” Order at 11, only obfuscates the fact that our en banc panel has blocked Arizona’s voting law, declared it presumptively unconstitutional, and overturned the status quo the weekend before voting ends, all without first taking the time needed to gain a thorough mastery of the record, to hear oral argument from the parties, or to write a considered opinion.
*414 As the majority is quick to remind us, the issues in this ease are important.[8] Those issues deserved more than seventy-two hours of consideration. This court’s hasty rush to decide those issues on the basis of ad hoc procedure is regrettable. I fear our action in this case will set a precedent that will harm not only the current election in Arizona, but presumably many more down the line, whenever a State enacts a voting regulation that more than half of the active judges on the Ninth Circuit simply deem unwise.
I respectfully dissent.

. The majority believes the district court’s findings of fact are reviewed by this Court for clear error because the district court has superior fact-finding capabilities. Maj. Op. at 380. The majority also believes a district court’s answer to the ultimate question— . whether there was a § 2 violation — is a finding of fact entitled to deference. The, majority cites Gonzales for that proposition. However, the district court did not conduct any eviden-tiary hearings to resolve disputed factual issues, and most of the record is undisputed, and the parties’ submissions were by affidavit. Furthermore, the district court here did not determine whether there was a § 2 violation because, unlike in Gonzales, we are not yet at ■the merits stage of the inquiry. This is, an appeal of a denial of a preliminary injunction, so we are reviewing the district court’s determination that the plaintiffs are unlikely to succeed on the merits of their claims. In my view, the plaintiffs are likely to succeed on the merits and the district court reached the opposite conclusion, because it made errors of law. Therefore, review is de novo as to those questions. Pom Wonderful LLC, 775 F.3d at 1123. Most of the district court’s opinion involves a mixed question of law and fact. In election cases, as with other appeals, we review such decisions de novo. United States v. Blaine County, Montana, 363 F.3d 897, 909 (9th Cir. 2004).

. The majority concludes that because Arizona's regulatory interests are sufficient to justify the "minimal burden” imposed by H.B. 2023, "the district court was not required to conduct a means-end fit analysis here.” Maj. Op. at 391, That is an erroneous interpretation of Supreme Court and our precedent. "The Supreme Court delineated the appropriate standard of review for laws regulating the right to vote in Burdick v. Taku-shi[:T it is a "balancing and means-end fit framework.” Pub. Integrity All., 836 F.3d at 1024. A court may not avoid application of a means-end fit framework in favor of rational basis .review simply by concluding that the *397 state’s regulatory interests justify the voting burden imposed. Moreover, Burdick tells us that in weighing “the character and magnitude of the asserted injury” against the “precise interests put forward by the State as justifications for the burden imposed by its rule,” we must take into consideration “the extent to which those interests make it neces-saty to burden the plaintiff’s rights." 504 U.S. at 434, 112 S.Ct. 2059. In this case, the State’s asserted interest does not make neces-saty the substantial burden on the voting rights of minorities. Simply put, the State's end does not fit the means employed.

. The majority asserts that plaintiffs in this case are bringing a facial challenge to H.B. 2023 and they therefore bear a “heavy burden of persuasion” because such challenges "raise the risk of premature interpretation of statutes.” Maj. Op. at 388 (internal quotations omitted). It is worth noting that neither the plaintiffs nor the defendants categorize the challenge to H.B. 2023 as a facial challenge; only the majority opinion does so. It is also worth noting that securing a court’s interpretation of the effects of H.B. 2023 before the law is enforced is the point of seeking a preliminary injunction. But for my part, I think this is a distinction without a difference because "[t]he underlying constitutional standard [in an as applied challenge] ... is no different th[a]n in a facial challenge.” Legal Aid Servs. of Or. v. Legal Servs. Corp., 608 F.3d 1084, 1096 (9th Cir. 2010) (quoting Velazquez v. Legal Servs. Corp., 462 F.3d 219, 228 (2d Cir. 2006)). "Facial and as-applied challenges differ in the extent to which the invalidity of a statute need be demonstrated (facial, in all applications; as-applied, in a personal application). Invariant, however, is the substantive rule of law to be used. In other words, how one must demonstrate the statute’s invalidity remains the same for both types of challenges, namely, by showing that a specific rule of law, usually a constitutional rule of law, invalidates the statute, whether, in a personal application or, to all.” Velazquez, 462 F.3d at 228 (emphasis in original).

. Plaintiffs assert an additional Constitutional claim under the First Amendment. In my view, the district court erred in concluding that H.B. 2023 did not burden their First Amendment associational rights. However, in my view, the district court did not abuse its discretion in denying a preliminary injunction based on this independent claim.

. The majority opines that "[w]hile § 2 itself does not require quantitative evidence, past cases suggest that such evidence is typically necessary to establish a disproportionate burden.” Maj. Op. at 381. The majority also notes that plaintiffs' briefs rely on vote dilution cases but not vote denial cases in arguing that statistical evidence is not required to establish a § 2 violation. Maj. Op. at 382 fn. 14.. I perceive no reason why the type of § 2 case on which plaintiffs rely is of consequence to their argument about what § 2 itself requires. Likely plaintiffs could not rely on a vote denial case for the stated proposition because of the practical reality that in a vote denial case, quantitative evidence of the effect of a rule on voting behavior is only available after an election has occurred, at which point the remedial purpose of the Voting Rights Act is no longer served. Plaintiffs in vote dilution cases, in contrast, can often gather and analyze quantitative data before an election. See, e.g., Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct, 2752, 92 L.Ed.2d 25 (1986).

. The order alternately discusses whether to grant an “injunction” pending appeal, Order at 6, and a “stay” pending appeal, id. at 6, 11. Stays and injunctions are two different things: a stay postpones the judgment or order of a court; an injunction, of course, commands or prohibits action by a third party. See, e.g., Fed. R. App. P. 8 (Stay or Injunction Pending Appeal); “Injunction,” Black’s Law Dictionary (10th ed. ,2014); “Stay,” Black's Law Dictionary (10th ed. 2014). Because before today no court has ordered Arizona not to enforce H.B. 2023, the majority presumably means that today it issues an injunction against the State from enforcing a particular statute.

. Early voting in Arizona began more than three weeks ago, on October 12.

. Likewise, the Court stayed a permanent injunction imposed by a district court and affirmed by the Sixth Circuit on September 24, 2014, which would have required Ohio to add early in-person voting hours. See Husted v. Ohio State Conference of N.A.A.C.P., — U.S. -, 135 S.Ct. 42, 189 L.Ed.2d 894 (2014), rev’g sub nom. Ohio State Conference of N.A.A.C.P. v. Husted, 768 F.3d 524 (6th Cir. 2014). And, in Frank v. Walker, the Court vacated the Seventh Circuit’s September 26, .2014 stay of a preliminary injunction enjoining application of Wisconsin’s voter ID law, which had been put in place by the district court in April 2014. See — U.S. -, 135 S.Ct. 7, 190 L.Ed.2d 245 (2014), rev’g in part, Frank v. Walker, 769 F.3d 494 (7th Cir. 2014), rev’g, 768 F.3d 744 (E.D. Wis.).

. This lack of factual support is a recurring theme, and another reason this court should wait until after the election to act. See Purcell, 549 U.S. at 6, 127 S.Ct. 5 (Stevens, J., concurring) ("Allowing the election to proceed without enjoining the statutory provisions at issue will provide the courts with a better record on which to judge their constitutionality.”). This court should "take[] action[s] that will enhance the likelihood that [important factual issues] will be resolved correctly on the basis of historical facts rather than speculation.”

Id.

. [1] Rational basis review only requires the legislature to have some rational reason for the law, even if it is not important and even if the judge, rather than the legislature, proffers that reason. E.g., Williamson v. Lee Optical of Okla. Inc., 348 U.S. 483, 487-88, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

. Sometimes we are forced to act under time pressure, such as death penalty habeas review, but while the final orders may issue hours before execution, these cases are usually the cumulation of years of carefully considered litigation.

. Supra note 1.

. Indeed, the majority strongly implies the issues are so important that they need to be decided right away. But every voting rights case pits similar arguments about the fundamental right to vote against arguments about a State’s need and right to regulate its elections. See, e.g., Crawford, 553 U.S. at 191, 128 S.Ct. 1610.
To accept the majority’s argument that the importance of this case compels action leaves one wondering what change in election law would not qualify as important. Cf. Clingman v. Beaver, 544 U.S. 581, 593 [125 S.Ct. 2029, 161 L.Ed.2d 920] (2005) ("To deem ordinary and widespread burdens [on voting] like these severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes.”). This “importance” exception would whittle Purcell down to nothing. As Justice Stevens explained in Purcell, it is precisely because these issues are important that we should not rush to decide them. See, 549 U.S. at 6 [127 S.Ct. 5] (Stevens, J., concurring).

. The Commission on Federal Election Reform was organized by American University's Center for Democracy and Election Management and supported by the Carnegie Corporation of New York, The Ford Foundation, the John S. and James L. Knight Foundation, and the Omidyar Network. It was co-chaired by former President Jimmy Carter and former Secretary of State James Baker.